

# FIRST QUARTERLY REPORT OF 2020
# FROM THE
# INDEPENDENT MONITOR
# FOR THE U.S. VIRGIN ISLANDS POLICE DEPARTMENT



   

**CHARLES A. GRUBER CONSULTING, INC.**
**INDEPENDENT MONITOR**
**www.imt-policemonitor.org**
**May 18, 2020**

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**PAGE INTENTIONALLY LEFT BLANK**

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

## NDEPENDENT MONITORING TEAM

### Independent Monitor

**Chief Charles A. Gruber (Retired)**
            **Elgin, Illinois Police Department**

### IMT Staff

**Superintendent Ann Marie Doherty (Retired)**
            **Boston, Massachusetts Police Department**

**Chief Chet Epperson (Retired)**
            **Rockford, Illinois Police Department**

**Jerome A. Needle**
      **Director of Programs & Research, International Association of Chiefs of Police (Retired)**

**Palmer D. Wilson**
      **Lieutenant (Director), Office of Staff Inspections, Montgomery County, Maryland Department of Police (Retired)**

**Leon A. Casey, Sr.**
      **Resident Agent in Charge, U.S. Customs Service (Retired)**

**CHARLES A. GRUBER CONSULTING, INC.**
**INDEPENDENT MONITOR**
**www.imt-policemonitor.org**

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**PAGE INTENTIONALLY LEFT BLANK**

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

## Contents

I.   EXECUTIVE SUMMARY .................................................................9

II.   USE OF FORCE ........................................................................15

III.   CITIZEN COMPLAINTS/MANAGEMENT & SUPERVISION ...........36

IV.   TRAINING ..............................................................................53

V.   IMMEDIATELY AVAILABLE FIXES ........................................88

VI.   APPENDICES ..........................................................................89

    APPENDIX A .............................................................................. 89

    APPENDIX B................................................................................ 95

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**PAGE INTENTIONALLY LEFT BLANK**

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**The information in this document covers activity between 02/08/20 and 05/01/20 unless otherwise stated.**

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**LIST OF ACRONYMS**

| | |
|---|---|
| AIU | VIPD Audit and Inspection Unit |
| APC | VIPD Assistant Police Commissioner |
| CBA | Collective Bargaining Agreement |
| CC | Citizen Complaint |
| CCMU | VIPD Compliance and Change Management Unit |
| CD | VIPD Consent Decree |
| Court | U.S. District Court for the U.S. Virgin Islands |
| CEW | Conducted Energy Weapon (TASER) |
| EIP | VIPD Early Intervention Program |
| EIPro | Early Intervention component of the IAPro computer system |
| FII | Force Investigations Inspector, VIPD Policy 3.2 |
| FIT | Force Investigation Team, VIPD Policy 3.15 |
| FRB | Force Review Board, VIPD Policy 3.3 |
| IAB | VIPD Internal Affairs Bureau |
| IACP | International Association of Chiefs of Police |
| IAPro | VIPD adopted Internal Affairs Management System; also Risk Management System (RMS) |
| IMT | Independent Monitoring Team, supervised by the Independent Monitor |
| M&S | Management and Supervision area of paragraphs within the Consent Decree |
| MSWG | Management and Supervision Workgroup |
| NISC | Not in Substantial Compliance |
| OPS | VIPD Office of Professional Standards |
| PDMS | PowerDMS, the VIPD selected Training and Policy cloud-based records system |
| PPE | Police Practice Expert |
| RMS | VIPD acronym for the IAPro system and supporting components |
| RRR | VIPD Response to Resistance Report, used to report use of force by employees |
| SC | Substantial Compliance |
| STJ | St. John Island, USVI |
| STT | St. Thomas Island, USVI |
| STX | St. Croix Island, USVI |
| TB | VIPD Training Bureau |
| TD | VIPD Training Director |
| Territory | Territory of the U.S. Virgin Islands |
| UOF | Use of Force, as defined in VIPD Policy 3.1 |
| UOFWG | VIPD Use of Force Workgroup |
| USA | U.S. Attorney for the U.S. Virgin Islands |
| USDOJ, DOJ | U.S. Department of Justice |
| VIPD | U.S. Virgin Islands Police Department |

## I.  <u>EXECUTIVE SUMMARY</u>

Five (5) Substantial Compliance Quarters are now complete. For current context and historical perspective, we begin this Report with a snapshot of the compliance status record to date.

### A.  <u>Sustainment Trajectory</u>

The Consent Decree (CD) obligates the VIPD to comply with 51 substantive paragraphs.  At this juncture the VIPD is complying with roughly 82% of paragraphs and is not complying with roughly 18% .  Closing the gap seems reachable, quantitatively.  The challenge lies in qualitative deficiencies.

Table 1 notes the paragraphs which have fallen out of compliance since substantial compliance was achieved in December 2018 (fourth quarter of 2018).  A pattern is clear.  The VIPD held compliance for six (6) months, Quarters 1 and 2 in 2019; spiraled downward in Quarter 3, 2019; regressed further in Quarter 4, 2019 and Quarter 1, 2020.  The problem paragraphs have remained essentially the same from quarter-to-quarter.

### B.  <u>First Quarter 2020</u>

This quarter closed with ninet (9) paragraphs failing to meet compliance standards:

- Use of Force:  Paragraphs 34 and 37.
- Citizen Complaints:  Paragraphs 46, 51, 54, 56, 57, and 58.
- Management & Supervision:  Paragraph 65.
- Training is compliant.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**Table 1**

**IMT Sustainment Summary**

| QUARTER | NON-COMPLIANT PARAGRAPHS | TOTAL |
|---|---|---|
| 1Q2019 | • Compliance Sustained. | Zero (0) |
| 2Q2019 | • Use of Force Paragraph 37 not compliant.<br>• M&S Paragraphs 59-65 placed on warning.<br>• Training remains compliant; two warnings issued. | One (1) |
| 3Q2019 | • Use of Force Paragraph 37 not compliant.<br>• Citizen Complaints Paragraphs 46, 51, 52, 54, 57 and 58 not compliant.<br>• M&S Paragraph 65 not compliant.<br>• Training remains compliant. | Eight (8) |
| 4Q2019 | • Use of Force Paragraph 37 not compliant; Paragraph 34 placed on warning.<br>• Citizen Complaints Paragraphs 46, 51, 54, 57 and 58 not compliant.  Paragraph 44 precarious<br>• M&S Paragraph 65 not compliant<br>• Training – spotted improvements needed. | Seven (7) |
| 1Q2020 | • Use of Force Paragraph 34 and 37 not compliant.<br>• Citizen Complaints Paragraphs 46, 51, 54, 56, 57, and 58 are not compliant.  Paragraph 55 is on warning.<br>• M&S Paragraph 65 not compliant.<br>• Training compliant. | Nine (9) |

Source:  IMT Quarterly Reports to the Court 1Q2019 through 1Q2020.

The primary Use of Force deficiencies (the obstacles to compliance) are:  supervisors fail to adhere to Policy and the Consent Decree requirements; commanders compound the issue by not thoroughly reviewing investigations; inability of the VIPD to hold subordinates accountable for actions; consistently missing collective bargaining agreement date deadlines for discipline investigations.

The primary Citizen Complaints deficiencies (obstacles to compliance) are: (inability and unwillingness to hold supervisors accountable).

The primary M&S deficiencies (obstacles to compliance) are:  lack of urgency and continuing unsuccessful efforts to address IAPro lack of compliance with CD requirements.

## C.  <u>Training</u>

The last comprehensive review of Training was presented one (1) year ago, 1Q2019.  This Report features the current status.  Unlike each of the other CD paragraph groups, the IMT consistently recommended that the Court find Training to be in compliance.  Warnings did occur.

As the First Quarter of 2020 closed, the VIPD was maintaining compliance with the primary Training paragraphs as well as the Training-related sub-components of other paragraphs.  The ransomware attack on the IAPro Risk Management database and the coronavirus epidemic have presented challenges for the Training Unit. Both of these situations forced the VIPD and its Training Bureau to rapidly alter plans and seek alternative methods of training delivery in order to maintain compliance. To the extent physical and fiscal resources have allowed, they have been successful.  They still require some follow-on activities once the two problems resolve. Despite these challenges, they continue to exert substantial effort to retain compliance status, and have sought out and implemented alternative solutions.  The IMT recommends to the Court that Substantial Compliance status for the Training activity noted in Consent Decree Paragraphs 73-81, be continued.

## D.  <u>Risk Management & IAPro</u>

The VIPD journey to restore Risk Management System capacity is documented in previous quarterlies.  Our last quarter M&S Report centered on lack of progress on IAPro recovery.[1]  The Quarterly cited what we judged to be an "…apparent lack of urgency to come back into compliance with CD paragraphs [that] is not acceptable."[2] Table 1, above, shows Paragraph 65 out of compliance for the past four (4) quarters.

This quarter, loss of remote access from homes of VIPD personnel compounded the fallout from the loss of remote function.   The IMT prepared a comprehensive, heavily documented

---

[1] 4Q2019 Report by the Independent Monitor for the U.S. Virgin Islands Police Department, 02/21/20, pages 31-32.
[2] Ibid, page 32.

Discussion Paper that detailed our assessment of IAPro and Risk Management capacity status and its dysfunctional CD compliance consequences.  Shared with and responded to by the VIPD, the Paper is presented in the M&S chapter of this quarterly.

From a capacity standpoint, the VIPD seems to have accomplished little on this matter during the past three months.  based on the April 21 VIPD Status Report to the Court:

> "VIPD has been working diligently to finalize the contracting process so that it can begin the work of enhancing the security of VIPD's network.  The Government has selected a vendor to provide the necessary security hardware upgrades and other technical consulting services.  VIPD anticipates that the contract process will be completed in the near future."[3]

We are concerned with the Virgin Islands Police Department's continued failure to correct Risk Management and IAPro Internal Affairs database compliance deficiencies.  We must report that in our judgment continued delays to regain compliance have now resulted in almost twelve months of non-compliance with no end in sight.  Coupled with languishing technical recovery, the VIPD is not demonstrating an obvious sense of urgency on this problem to regain compliance.

## E.  Evaluation Support Breakdown

Consent Decree compliance and evaluation work was carried out this Quarter, in its entirety, in the midst of the COVID-19 pandemic crisis.   Party and VIPD operations required adjustments.  The IMT suspended site visits, relying on various technologies for daily and weekly communications and VIPD submissions of information.  VIPD adjustments are reflected in the VIPD April 2020 Status Report to the District Court[4].

> "As a result of the COVID-19 pandemic, VIPD has put in place measures to promote social distancing and ensure the safety of its employees.  Some of these actions include teleworking and flexible work schedules to maintain social distancing while meeting its mission to the community.  The IMT has put off in-person monitoring due to the Covid-19 crisis.  In the interim, VIPD electronically

---

[3] Dkt 446, VIPD Status Report to the Court, 04/21/20, page 3.
[4] Ibid, page 1.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

transfers to the IMT documents requested by the IMT.  Additionally, the IMT and VIPD continues to have weekly scheduled meetings and other meetings as deemed necessary."

Status Report phrasing concerning electronic transfer is true – as far as it goes.  It is simultaneously misleading.  Transfers were delinquent in some cases, unfulfilled in others.  Whether pandemic-centered adjustments contributed to the information flow delays is not something we are able to comment on.  Note, however, this is not a new issue.  We covered it last Quarter under Evaluation Support Breakdown[5]

The VIPD Status Report ends with:

"Even with the challenges and uncertainties caused by the COVID-19 pandemic, VIPD remains committed to maintaining substantial compliance with each provision of the Consent Decree.  Where VIPD has determined that additional actions are necessary to maintain substantial compliance, such actions are being taken."[6]

We note that monitoring and evaluation support has not been and is not what is required.  For sustainment decision-making, a major goal of the sustainment period is that the VIPD build and demonstrate substantially effective self-managing information production and CD diagnostic capacity.  The Evaluation Support Breakdown performance deserves a "no confidence" judgment from the IMT at this moment in time.

## F.  **Immediate Response Options**

The VIPD is already positioned to take actions that should promote progress toward compliance, especially the problem paragraphs:

- Revisit and strengthen the FII function.
- Incorporate lessons learned – the FII experience to date into the parallel CCII function roll-out.
- Systematize and follow through on the most promising recommendations from the CCMU, FRB, and command staff.

---

[5] 4Q2019 Report by the Independent Monitor for the U.S. Virgin Islands Police Department, 04/21/20, page 9.
[6] Ibid, page 4.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

For several quarters now, the IMT and CCMU have been working collaboratively to find common ground on compliance-focused evaluation diagnostic guidelines. This process already has and should continue to contribute more favorable compliance outcome metrics.   (See Assessment Protocol for 1Q2020 Review in Chapter III.)

Finally, each of the deficiencies listed above is supervisor-centric to some degree. It seems reasonable to consider that the totality of VIPD interventions to date to upgrade the CD performance of supervisors have not been effective enough.     Accordingly, the IMT is recommending a training initiative that differs from those employed by the VIPD thus far – a supplement not a replacement.  We suggest that the VIPD design and develop a broad-based supervisor and commander basic and on-going training program we call, for now, "Front Line Leading and Managing." This course would cover all of the basic skills needed at each level of responsibility as well as any specifically required by the CD. The intent is to support a department supervisor and manager (commander) career development program to provide personnel assuming these positions the people and management skills necessary to overcome the accountability issues that have been long identified.  Unlike the actions referenced above, which are fundamentally implementation ready, this initiative should be viewed as near future.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

## II.   USE OF FORCE

The VIPD achieved substantial compliance with the provisions of the Consent Decree in December 2018.  At the time, the IMT opined to the Court the importance of the VIPD to stay vigilant with its focus on Paragraph 37, one of the last Force Paragraphs submitted to the Court for compliance approval.  Achieving compliance for this paragraph had been a struggle for the VIPD.

The IMT has provided evidence in quarterly reports and in direct testimony to the Court for the past four quarters of the VIPD's failure to maintain compliance with Paragraph 37.  VIPD supervisors, commanders, and higher-ranking police executives are not following their own polices and Consent Decree requirements.  Supervisors are not holding subordinates accountable for the thoroughness of use of force investigations. At the same time, the supervisors' superiors are not providing appropriate direction to subordinates who investigate use of force incidents. The superiors are often remiss in assessment and evaluation of supervisors use of force investigations.

Accountability provisions are outlined in VIPD Policy and the Consent Decree.   VIPD Commissioner's Directive pertaining to the Force Investigator Inspector establishes adequate accountability provisions.  Still, the entire chain of command often defers to the Use of Work Group, which is not a defined entity in VIPD Policy 3.2.  The current Use of Force Work Group does not contain accountability provisions and ensuring compliance with VIPD Policy and or the Consent Decree.  Supervisors and their superiors must know how to evaluate use of force deficiencies and recommend corrections reliably and transparently. That is what the Consent Decree requires and what the VIPD is failing to accomplish currently.

Substantial compliance does not require perfection.  It does require demonstration of the capacity to recognize performance weaknesses and utilize critical thinking to fix the issues as opposed to continuing to repeat missteps time after time.  At this point of the Consent Decree, the VIPD should be performing at a more acceptable rate of compliance with terms of VIPD Policy and the

Consent Decree.   The VIPD maintains the appropriate policies and procedures for ensuring compliance with the Consent Decree.   Their non-compliance with the Consent Decree is a result of improper personnel decisions in using force, investigating force, reviewing force, and holding personnel accountable for force actions, each and all inhibiting compliance with Paragraphs 34 and 37.

## A.  First Quarter 2020 Compliance Assessment Results

This quarter, the IMT assessed ten (10) Use of Force Incidents comprising 18 reportable uses of force, 100% of all approved Use of Force Incidents completed this quarter.  Table 2 displays case incidents, force levels, types of force, and Consent Decree Paragraph issues.

**Table 2**
**Compliance Assessment Results**

| Case Number | Force Level | Type of Force | Consent Decree Paragraph |
|---|---|---|---|
| UOFX2020-0005, 0012, 0013 | Level 4 | Grabbed | 32, 34, 37 |
| UOFX2020-0011 | Level 4 | Pointing a Firearm | 34, 37 |
| UOFT2019-0098, 0099 | Level 2 | Grabbing, Takedown, and Pain Compliance | 33, 34, 36, 37 |
| UOFX2020-0004 | Level 4 | Pointing a Firearm | 33, 34, 37 |
| UOFX2010-0001 | Level 4 | Grabbing | 34, 37 |
| UOFT2020-0007, 0008 | Level 4 | Grabbing, Hands | No issues |
| UOFT2019-0100, 0101, 0102 | Level 3 | Grabbing, Takedown | No issues |
| UOFT2020-0004, 0005 | Level 4 | Grabbing | No issues |
| UOFX2020-0002, 0003 | Level 3 | Grabbing, Takedown | No issues |
| UOFX2020-0008 | Level 4 | Grabbed | No issues |

The following are the major findings:

- 50% of the incidents (5) were assessed to be in compliance with all Consent Decree requirements.

- 50% of the incidents (5) were assessed to be out of compliance with some Consent Decree requirements.

- Each of the (5) incidents assessed to be out of compliance had failed to comply with more than one Consent Decree requirement (Range:  1-4).

Table 3 shows the compliance rate for the assessed use of force incidents by the five identified Consent Decree Paragraphs.

**Table 3**
**Compliance Rates**

| PARAGRAPH | DEFICIENCIES FOUND | COMPLIANCE RATE |
|---|---|---|
| 32 | 1 of10 | 90% |
| 33 | 2 of 10 | 80% |
| 34 | 5 of 10 | 50% |
| 36 | 1 of 10 | 90% |
| 37 | 5 of 10 | 50% |

Compliance at 50% for Paragraphs 34 and 37 falls well below the required standard for the VIPD to maintain compliance with the use of force provisions of the Consent Decree.  A 50% assessment could be expected of a police agency in the infancy of a Consent Decree, but not the VIPD which has been engaged with their Consent Decree for well over 10-years.

**B.  Use of Force Paragraph Requirements**

The Consent Decree sets forth specific requirements and steps when a VIPD officer uses and reports force; when a supervisor investigates force; for the final phase and approval of a use of force incident.

31.    The VIPD will review and revise its use of force polices as necessary to:

a.    define terms clearly;

b.    define force as that term is defined in this Agreement;

c.    incorporate a use of force model that teaches disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements or calling in specialized units as appropriate responses

17

to a situation;

d.      advise that, whenever possible, individuals should be allowed to submit to arrest before force is used;

e.      reinforce that the use of excessive force will subject officers to discipline, possible criminal prosecution, and/or civil liability;

f.      ensure that sufficient less lethal alternatives are available to all patrol officers; and

g.      explicitly prohibit the use of choke holds and similar carotid holds except where deadly force is authorized.

Once the DOJ has reviewed and approved these policies, the VIPD shall immediately implement any revisions

32.     The VIPD will require all uses of force to be documented in writing. The use of force report form will indicate each and every type of force that was used, and require the evaluation of each type of force. Use of force reports will include a narrative description of the events preceding the use of force, written by a supervisor or by the designated investigative unit. Use of force reports also will include the officer(s)' narrative description of events and the officer(s)' statement. Except in cases of use of force involving the lowest level of force as defined in VIPD policy as approved by DOJ, the officer's statement shall be audio- or videotaped.

33.     Officers shall notify their supervisors following any use of force upon the receipt of an allegation of excessive force. Except in uses of force involving the lowest level of force as defined in VIPD policy as approved by DOJ, supervisors will respond to the scene, examine the subject for injury, interview the subject for complaints of pain, and ensure that the subject received needed medical attention.

34.     Supervisors, or designated investigating officers or units, will review, evaluate, and document each use of force, and will complete the narrative description section of the use of force report. The narrative description will include a precise description of the facts and circumstances that either justify or fail to justify the officer's conduct. As part of this review, the supervisor or designated investigating officer/unit will evaluate the basis for the use of force, and determine whether the officer's actions were within VIPD policy. An officer who used force during the incident, whose conduct led to an injury, or who authorized conduct leading to the use of force or allegation of excessive force, or who was present during the incident, will not be eligible to review or investigate the incident.

35.     The parties agree that it is improper interview procedure during use of force investigations to ask officers or other witnesses leading questions that improperly suggest legal justifications for the officer's conduct when such questions are contrary to

appropriate law enforcement techniques. In each review/investigation, the VIPD will consider all relevant evidence including circumstantial, direct and physical evidence, as appropriate, and make credibility determinations, if feasible. The VIPD will make all reasonable efforts to resolve material inconsistencies between witness statements. The VIPD will train all of its supervisors and officers assigned to conduct use of force investigations in conducting use of force investigations, including in the factors to consider when evaluating credibility.

36.     Supervisors, or designated investigating officers or units, shall conduct an investigation of all uses of force or injury resulting from a use of force by any officer under their command. This requirement does not apply to uses of force involving the lowest level of force as defined in VIPD policy as approved by DOJ. In an investigation, supervisors or designated investigating officers or units, shall interview all witnesses to a use of force or an injury resulting from a use of force. Consistent with the requirements of the collective bargaining agreement or other applicable law, VIPD supervisors or designated investigating officers or units shall ensure that all officer witnesses provide a statement regarding the incident. Supervisors, or designated investigating officers or units, shall ensure that all use of force reports for all levels of force identify all officers who were involved in the incident or were on the scene when it occurred. Supervisors, or designated investigating officers or units, shall ensure that all reports for all levels of force indicate whether an injury occurred, whether medical care was provided, and whether the subject refused medical treatment. Supervisors, or designated investigating officers or units, shall ensure that all reports include contemporaneous photographs or videotapes taken of all injuries at the earliest practicable opportunity, both before and after any treatment, including cleansing of wounds.

37.     All investigations into use of force shall be reviewed by the Officer's Commander and/or Director, or by a Commander and/or Director in the designated investigative unit, who shall identify any deficiencies in those reviews, and shall require supervisors, or designated investigative officers or units, to correct any and all deficiencies. Supervisors, and designated investigative officers or units, will be held accountable for the quality of their reviews. Appropriate non-disciplinary corrective action and/or disciplinary action will be taken when a supervisor, or designated investigative officer or unit, fails to conduct a timely and thorough review, or neglects to recommend appropriate corrective action, or neglects to properly implement appropriate corrective action. As provided by VIPD policy and approved by DOJ, designated command staff shall further review the Commander and/or Director's reviews according to the level of force involved.

## C. **Deficiency Patterns**

The five (5) non-compliant use of force incidents contained a total of fourteen (14) identifiable types of Consent Decree deficiencies. These failures types are shown in Table 4, below.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**Table 4**
**Failure Types**

| Consent Decree Paragraph Concern | Frequency | Case Numbers | Failure Type |
|---|---|---|---|
| | | | |
| 32 | 1 | UOFX2020-0005, 0012, 0013 | 1.  An incident occurred where the subject of force and involved subject of force fell to the ground. There was no indication as to how the subject of force and or officer fell to the ground.  The IMT and VIPD discussed this incident.  The VIPD CCMU came to a similar conclusion on this incident and it was discussed the supervisor may have inquired as to how the officer fell to the ground, but there is no documentation as to how the falling to the ground occurred. |
| 33 | 2 | UOFT2019-0098, 0099 UOFX2020-0004 | 1.    An incident lacked of notification to a supervisor of a use of force incident.  An off-duty seasoned supervisor was involved in the use of force incident and did not properly contact a supervisor.  Instead, the supervisor phoned several Internal Affairs Investigators.    One of the investigators instructed him to contact a supervisor. The supervisor and involved officer proceeded to the police station to complete their paperwork and several supervisors and commanders were present when the off-duty supervisor was present in the station.  The supervisors failed in interjecting their authority in determining the reason(s) as the off-duty supervisor being in the police station.<br><br>2. A deputy chief contacted the Internal Affairs Bureau regarding his actively pointing of a firearm. There was no mention of this in the IAB investigative report.    The IMT and CCMU collaborated on this incident and we learned the deputy chief contacted the IAB Director regarding the use of force incident.  This was learned on March 31, 2020, and the IMT was told there was a revised investigative report.    The IMT has requested the revised report and after twenty-seven (27) days, the IMT has not received the requested documentation. |
| 34 | 5 | UOFT2019-0098, 0099 UOFX2020-0001 UOFX2020- | 1. A supervisor was finally assigned to investigate the matter some 8-hours after the incident.  The supervisor met and conferred with the subject of force the next day and inquired as to what |

| | | 0004 UOFX2020-0005, 0012, 0013 UOFX2020-0011 | occurred. The subject of force could not remember what occurred during the incident. The supervisor failed to provide a full and accurate description of what occurred during the use of force incident. More importantly, the subject of force injures were not assessed fully in order to determine what occurred in order to either justify or fail to justify the officer's actions.

2. There were concerns regarding the involvement of a witness officer, who may have been involved in the incident. The response to resistance report lacks specific facts and circumstances as to what occurred. The supervisor's evaluation did not include a precise description of the facts and circumstances that either justify or fail to justify the officer's conduct. The VIPD CCMU had a similar finding.

3. An investigation of a deputy chief actively pointing an assault rifle at two individuals lacked a precise description of the facts and fails to justify the officer's conduct. The deputy chief did not conform to the Graham Factors: identify the type of crime; threat of the suspect(s); were the suspect(s) actively resisting arrest and or fleeing the scene. Key information was missed in the evaluation of this incident to justify the conduct of the deputy chief.

4. An officer fell to the ground with a subject of force. The investigating supervisor did not articulate as to how the officer and subject of force fell to the ground.

5. An investigating supervisor missed key information from an incident of a supervisor actively pointing a firearm in the direction of an individual. The incident missed key information. |
| 36 | 1 | UOFT2019-0098, 0099 | 1. Involved officers in a use of force incident failed to notify their supervisor. The incident involved an injury to the subject of force. The subject was treated at the hospital. The investigating supervisor did not make an assessment regarding the injury until the next day. No witness interviews were conducted at the time of the incident. |
| 37 | 5 | UOFT2019-0098, 0099 UOFX2020-0001 | 1. The following use of force incident contains several deficient areas, which the final reviewer did not thoroughly evaluate and assess. The following |

| | | UOFX2020-0004<br>UOFX2020-0005, 0012, 0013<br>UOFX2020-0011 | points provide serious issues with the tenants of compliance with this paragraph:<br><br>• The investigating supervisor noted a month after the incident disciplinary charges would be filed against the off-duty supervisor for his failure to contact a supervisor. The investigating supervisor filed the charges against the officer one (1) day after the required Law Enforcement Supervisor's Union (LESU) provides a 50-day maximum requirement for filing charges. The Hearing Officer dismissed the incident against the involved supervisor. The investigative package and or records do not provide documentation the investigating supervisor was counseled for failing to meet the CBA requirements.<br>• The investigating supervisor stated the off-duty supervisor complied with the provisions of VIPD Off-duty policy 3.8. The policy requires specific requirements for off-duty personnel. The off-duty supervisor did not fulfill the requirements of the policy, which requires an off-duty to contact a supervisor when involved in an off-duty law enforcement incident. The investigating supervisor did not inquire into the subject of force injuries.<br>• The investigating supervisor did not conduct the audio interviews under the required time limits as per VIPD Policy.<br>• The final review by a lieutenant provided a final disposition of Justified Within Policy. Several policy violations were identified in a joint CCMU/ IMT review.<br>• . There is no assessment of the off-duty supervisor stepping on the legs/ ankles of the subject of force and using such pain compliance technique. The IMT could not locate such movement in an approved VIPD lesson plan.<br><br>2. There were concerns regarding the involvement of a witness officer, who may have been involved in the incident. The response to resistance report lacks specific facts and circumstances as to what occurred. The supervisor's evaluation did not include a precise description of the facts and circumstances that either justify or fail to justify |

|  |  |  | the officer's conduct. The final approver did not thoroughly assess this incident. The final reviewer did not hold their subordinate accountable for the quality of the force investigation review. Appropriate non-disciplinary correction and or disciplinary action was void.

3. An investigative report did not assess the use of an assault rifle. A deputy chief did not have the authority per VIPD Policy to utilize the weapon. The IMT learned through a most recent discussion the assault weapon is not an authorized weapon approved for use by the Police Commissioner. The IMT discussed the incident with the VIPD and CCMU on March 31, 2020. The investigative report did not contain an assessment of the use of force and or the use of the assault rifle.

4. An investigating supervisor does not assess on how an officer and subject of force fell to the ground. The investigative package includes several photographs of the subject of force. Specifically, there are photos in the investigative file that pertain to the eye and facial area of the individual. The supervisor's report does not contain information as to why the photographs were taken and or included in the investigative file; any mention as to any injuries the subject may have incurred. The final reviewer did not conduct a thorough review of their subordinate.

5. There was no assessment if the lieutenant considered any less-lethal force options besides actively pointing their firearm at the subject of force. The final reviewer in the chain of command should have inquired into the use of force before approving the incident along with assessing why the subject of force was not secured in handcuffs before running out of police station. |
|---|---|---|---|

## D.  Paragraphs 34 and 37 Shortcomings

Paragraphs 34 and 37 continue to hinder the VIPD's ability to maintain substantial compliance. The repeated weaknesses in the VIPD's inability to comply with Paragraphs 34 & 37 sustain the continuing and significant questions about the extent to which the VIPD can self-manage and hold itself accountable.   The substantial compliance period is an important time period for the

VIPD to demonstrate its ability to self-manage use of force, investigate force, review force and hold officers and supervisors accountable for failing to follow policy and procedures. This is the fourth consecutive quarter the IMT has provided documentation on VIPD's shortcomings with compliance with the requirements of Paragraph 37, particularly the issues of thoroughness and holding subordinates accountable. The following three (3) incidents demonstrate serious Paragraph 34 and 37 shortcomings:

## E. Drawing & Actively Pointing a Firearm

The VIPD has a strict policy on the use of drawing and pointing a firearm at individuals. Officers are generally prohibited from actively pointing a firearm at someone unless there are objectively and reasonable determination the situation may escalate to the point where deadly force would be justified. An officer who actively points their firearm at an individual has set up the potential for a deadly force encounter. The VIPD maintains a strong and supportive policy for drawing and actively pointing a firearm in the direction of an individual. VIPD Policy 3.1 - Use of Force, contains specific directions for personnel to follow when drawing and pointing firearms:

> *Officer are prohibited from drawing and pointing their firearms at or in the direction of a person absent an objectively reasonable determination that the situation may escalate to the point where deadly force would be authorized under this policy. Drawing and pointing a firearm at a human being is a reportable use of force. When it is determined that the use of deadly force is not necessary, officers shall, as soon as practicable, secure or holster their firearms[7].*

During this assessment, the IMT identified two incidents of VIPD personnel drawing and actively pointing their firearm at individuals. One of the incidents included a high-ranking VIPD superior actively pointing an assault weapon at individuals with a lack of an objectively reasonable reason. The following highlights the two incidents.

### Incident 1: UOFX2020-0004

---

[7] VIPD Policy 3.1 Use of Force Policy, dated 03/30/11, Section IV., D, 4, page 6.

A deputy chief of police observed two individuals along the roadway as he passed them in his squad car.  The individuals had their faces obscured with their hoodies.  It appeared to the deputy chief the individuals were going to fight each other.  The deputy chief turned his squad around in order to inquire on the activity of the two individuals.  At the same time, the deputy chief requested information from the 911 Center if any criminal activity had been reported.  The deputy chief learned there was either a robbery or possible robbery attempt at the KFC restaurant.  The deputy chief turned his squad around and proceeded back to the area.  He observed the males running west from the area.  The deputy chief located the two individuals running in the area and he removed his .45 caliber assault rifle, pointed it at both males and ordered them to the ground.  One of the individuals complied and dropped to the ground.  The second individual pulled out a firearm from his waistband and discharged four (4) rounds at the deputy chief.  A back-up officer responded and took the male who complied into custody.   A criminal investigation ensued for the second subject.

The IMT and the CCMU met and conferred regarding this use of force incident. Although the incident was approved within VIPD Policy, the IMT came to a different conclusion and did not support the actively pointing of a firearm.  The IMT also learned the CCMU came to a similar finding.

The deputy chief contacted the Internal Affairs Director regarding the use of force, but this was not part of the supervisory reporting requirements (CD Paragraph 33).  The investigation was conducted by an Internal Affairs investigator.

The deputy chief stated when he observed the subjects running from him, their actions and appearance at that point, aroused his suspicion.  An officer is provided an opportunity when they are suspicious to make and conduct a further inquiry into one's activity. Officers rely on the Terry v Ohio 4th Amendment Standard to make an inquiry to criminal activity.  In this particular incident, the deputy chief observed two individuals, whom he observed "squaring off" as if they were about to engage in a fight.  The deputy chief inquired with communications what if anything was occurring in the area.  The deputy

chief learned there was a robbery or possible robbery at the Kentucky Fried Chicken. The deputy chief's report and or initial use of force investigation lacked the following:

- No connection between the two subjects the deputy chief initially observed, who were going to square off as being involved in the possible or robbery attempt
- No further inquiry from the deputy chief into determining the physical description of the individuals involved in the KFC incident.
- No indication as to the subject actions at the KFC.
- No indication if the subjects at the KFC were armed.

The investigative report failed to justify the deputy chief's actively pointing of an assault rifle at two individuals. (CD Paragraph 34).  The investigator failed to justify the deputy chief's actions under the Constitutional Standard of *Graham v Connor* in a police officer's use of force.  Pointing of a firearm is a use of force.  In this incident, the deputy chief failed to state why he actively pointed an assault weapon at the two individuals. The deputy chief failed to fully connect the two individuals with any crime; failed to state the threat from the individuals; failed to mention if and how the two individuals were either resisting arrest and or fleeing from the deputy chief.  Most importantly, there is no mention of the threat made to the deputy chief for his justification of actively pointing a firearm at two individuals running from the police.  The deputy chief stated in his use force report, "Central Dispatch confirmed that there was a robbery or possible robbery attempt at the Kentucky Fried Chicken (KFC) in Sunny Isles."  The initial and revised investigative reports do not mention "or a possible robbery" in their reports.

The investigative report did not assess the use of the assault rifle.  The deputy chief did not have the authority per VIPD Policy to utilize the weapon.  The IMT learned through a most recent discussion the assault weapon is not an authorized weapon approved for use by the Police Commissioner.  The IMT discussed the incident with the VIPD and CCMU on March 31, 2020.  The investigative report did not contain an assessment of the use of force and or the use of the assault rifle (CD Paragraph 37).  The IMT was told there would be a revised investigative report and as of April 22, 2020, the IMT has not received any updated investigative documents.

On May 8, 2020, the IMT received a revised investigative report for this incident. The revised report contains new information, which the IMT raised in the March 31, 2020, teleconference meeting. The revised report does not change the assessment of the IMT. The standards in Graham were not initially established from the deputy chief and this is the responsibility of the officer to establish for the justification of force, not an investigator.

Finally, the initial investigation did not contain a thorough assessment of what occurred during this incident and failed to mention the use of an unauthorized firearm (CD Paragraph 37).

**Incident 2:** **UOFX2020-0011**

Incident Information: An individual was in-custody for Contempt of Court and assault upon a police officer. Information revealed an officer suffered a fractured shoulder and was bitten by the subject in the previous incident. The subject was being processed in the police station and requested to use the bathroom. The subject took off from a police lieutenant and fled out of the police station. The lieutenant proceeded out of the police station in an attempt to locate the individual. The lieutenant located the individual hiding in some bushes. The male refused the supervisor's order and stated he did not want to go back to jail. The lieutenant actively pointed his firearm at the individual, who then cooperated. The male was then brought back to the police station. The lieutenant stated he felt an overwhelming fear for his safety and an additional supervisor who was with the lieutenant. The lieutenant failed to articulate on how deadly force would be possible for the escape and a prior incident involving an injury to a police officer. The investigating captain failed to articulate on how actively pointing a firearm was a justifiable use of force (CD Paragraph 34). In the event the subject did not cooperate with the officer, the officer was now forced into a deadly use of force situation. According to the arrest report, the male was a known mental patient. The report does not mention any disengagement with the known mental subject. There was no assessment if the lieutenant

considered any less-lethal force options and or if the lieutenants were equipped with less-lethal tools.  The final reviewer in the chain of command should have inquired into the use of force  along with assessing why the subject of force was not secured in handcuffs before running out of police station.  (CD Paragraph 37).

**Incident 3**: UOFT2019-0098, 0099

This incident began as a dispatched call for a man walking in and out of the flow of traffic.  The man was reported as interrupting the flow of traffic.  An officer gave commands to the male to step out of traffic.  A second call was received of the male remaining in the roadway and striking vehicles with his hand.  The same officer responded and gave verbal directions to the male.  The male was escorted out of traffic. As the man was being escorted out of traffic, he grabbed the officer's holstered Taser and began pulling it out of the holster.  The officer successfully applied a leg sweep takedown on the male.  The male then began to kick his legs at the officer and the officer struck the male with his baton several times on his leg.  The male continued to resist arrest and kick at the officer.  An off-duty supervisor responded to the scene to assist the officer.  The off-duty supervisor stood on the man's legs and ankles for purposes of pain compliance technique.  The officer was then able to secure the man into custody.

After the male was secured, the remaining parts of the incident and investigation fell apart and did not comport to VIPD Policy and or the Consent Decree:

- failure to contact a supervisor about the use of force;
- failure to contact a supervisor when an off-duty officer is involved in an off-duty incident; failure of the supervisor to respond to the scene of the use of force incident and investigate the use of force;
- supervisor unable to locate potential witnesses;
- failure of the supervisor to obtain photographs of injuries

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

At this stage of the department's status in substantial compliance with the Consent Decree, all parts of what should occur failed including the involvement of leadership in the proper handling of this investigation.

On April 17, 2020, the IMT met and conversed with the VIPD CCMU. The CCMU did a nice job of assessing each Consent Decree paragraph and providing their overall assessment. The IMT assessed the incident with several noted deficiencies. The CCMU provided similar findings.

The involved officers failed to notify a supervisor of a use of force incident (CD Paragraph 33). An off-duty seasoned supervisor was involved in the use of force incident and did not properly contact a supervisor. Instead, the supervisor phoned several Internal Affairs Investigators. One of the investigators instructed him to contact a supervisor. The supervisor and involved officer proceeded to the police station to complete their paperwork and several supervisors and commanders were present when the off-duty supervisor was present in the station. The supervisors failed in interjecting their authority in determining the reason(s) as the off-duty supervisor being in the police station, let along making an inquiry as to how an off-duty supervisor lodged an injured individual in jail.

A supervisor was finally assigned to investigate the matter some 8-hours after the incident (CD Paragraph 34). The supervisor met and conferred with the subject of force the next day and inquired as to what occurred. The subject of force could not remember what occurred during the incident. The supervisor failed to provide a full and accurate description of what occurred during the use of force incident. More importantly, the subject's injuries were not assessed fully in order to help determine whether the involved officer's actions were justified.

The subject of force was taken to the hospital without the knowledge of a supervisor notification (CD Paragraph 36). This missed opportunity negated contemporaneous photographs taken of the injured individual, both before and after any medical treatment.

The subject of force sustained lacerations on the rear of both his left and right arms above his elbows.  The investigating supervisor stated the injuries were a result of the subject actively resisting arrest on the ground where he was pulling his hands away from the involved officer and twisting his body.  This same supervisor stated he took a statement from the subject of force at the jail the day after the use of force incident.  The subject told the supervisor he does not remember being involved with the police only being treated at the hospital.  Thus, the supervisor must have speculated on how the subject sustained the injuries as opposed to receiving first-hand information.

The investigation failed to meet the requirements of a quality review and appropriate discipline (CD Paragraph 37):

1. The investigating supervisor noted a month after the incident disciplinary charges would be filed against the off-duty supervisor for his failure to contact a supervisor (Figure 1).  The investigating supervisor filed the charges against the officer one (1) day after the required Law Enforcement Supervisor's Union (LESU) provides a 50-day maximum requirement for filing charges.  The investigative file does not indicate as to why the investigating supervisor waited one day after 50-day requirement to file the charges.  To date, the IMT has received information as to the reasons for the delay and or any follow up action(s) regarding the supervisor.  The Hearing Officer dismissed the incident against the involved supervisor.  The investigative package and or records do not provide documentation the investigating supervisor was counseled for failing to meet the CBA requirements.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**Figure 1**
**25 Days UOF Review Memo**



2. The investigating supervisor stated the off-duty supervisor complied with the provisions of VIPD Off-duty policy 3.8.  The policy requires specific action for off-duty personnel.  The off-duty supervisor did not fulfill the requirements of the off-duty policy by contacting their immediate supervisor when involved in an off-duty police action.

3. The investigating supervisor did not inquire into the subject of force injuries.

4. The investigating supervisor did not conduct the audio interviews under the required policy limits.

5. The final review by a lieutenant provided a final disposition of Justified Within Policy.  Several policy violations were assessed in our review.  We later learned the CCMU had similar findings.

6. There is no assessment of the off-duty supervisor stepping on the legs/ ankles of the subject of force and using such pain compliance technique.  The IMT could not locate such movement in an approved VIPD lesson plan.

This incident consisted of a "total system failure" of accountability by the VIPD. This included the knowledge and involvement of several sergeants, lieutenants, Internal Affairs Bureau personnel, and district police chief. Someone in this circle should have taken the lead and ensured the VIPD Policies and Consent Decree Paragraphs were properly met and completed.

## F.  UOFX2019-0049

The IMT has requested the investigative files for this serious use of force incident since January 2020. On Friday May 8, 2020, the VIPD sent the IMT the final investigative report and citizen complaint regarding the incident involving a deputy chief of police. Due to the complex nature of this incident and the waiting of additional materials from the VIPD, the IMT will make a final assessment in a future report.

## G.  2020 Quarterly Deputy Chief Use of Force Assessments

The IMT assessed the following Deputy Chief Quarterly Reviews:

### St. Croix

### UOFX2019-0045, 0046

The IMT provided to the Court at the November 2019 Evidentiary Hearing the following:
The investigating supervisor failed to mention the involved officer had his body worn camera activated during the first half of the incident, but the half where the subject of force claimed he was choked by the officer. The investigating supervisor did not indicate as to why they did not probe into the BWC not being activated during the alleged choke hold. The deputy chief assessment did not assess a similar claim, even though the IMT opined in this matter and prior to the deputy chief assessment.

### UOFX2020-0005, 0012, 0013

As noted in our assessment, the IMT raised a concern in this incident involving the subject of force and officer falling to the ground. The investigating supervisor did not indicate on how the officer and subject fell to the ground. The IMT raised this issue in April 2020 and on May 8, 2020, the IMT received a revised version of the investigative report. The revised version

indicates on how the subject of force and officer fell to the ground.  The deputy chief review does not make a similar finding as the IMT.

**St. Thomas/ St. John**

**UOFT2019-0098, 0099**

The deputy chief assessed this incident and came to similar conclusions as the IMT. Unfortunately, those supervisors and commanders involved in this incident did not assess the incident as did the deputy chief.  There were recommendations for supervisor, but no indication as to who is responsible for the training.

To date, the IMT has not received feedback from the VIPD as to why the investigating supervisor missed the deadline to file charges.

**H.  Assessment of 2-year Use of Force Review Board Assessment**

On April 20, 2020, the VIPD provided a 2-year Use of Force Review analysis.  The assessment and analysis of this report will take time.  The analysis will be reported out in the 2QTR2020 Report.

**I.  Recommendation**

- **Revisit/Strengthen Force Investigations Inspector Function**

The VIPD implemented its Force Investigations Inspector (FII) function in 2018 to address errors in numerous completed use of force investigations.  The stated purposes of the FII process are to minimize supervisory errors in use of force investigations and to ensure compliance with VIPD policy and the Consent Decree.  At the time, the VIPD struggled to gain compliance with the Consent Requirements pertaining to use of force.  The VIPD concluded the best method to gain compliance with the Consent Decree was to initiate the FII.  The DOJ and the IMT supported the process and implementation of the FII. Commissioner's Directive 2018-006 was established as the FII. The VIPD came into compliance in December 2019 with the FII's doing the work.

The Directive requires the FII to demonstrate and display exemplary knowledge of force investigation requirements.  The FII is tasked to review and approve Level 2 and 3 Use of Force Investigations.  The FII is to aid in the facilitation of accurate, thorough, and complete investigations, and carry out specific duties relating to ensuring subordinate supervisors complete use of force investigations per VIPD Policy and the Consent Decree.  The FII possesses great autonomy in holding supervisors accountable for the quality of their investigations.   The FII can use appropriate non-disciplinary corrective action and/ or disciplinary action when a supervisor fails to conduct a timely and thorough investigation, neglects to recommend appropriate corrective action, or neglects to implement appropriate corrective action.

To date, the VIPD has not demonstrated the spirit and full intent of the FII concept and powers.  The VIPD continues to utilize the Work Group as a method to complete of use of force incidents.  The Work Group, although beneficial at the onset of the Consent Decree, should not assist the VIPD in their substantial compliance period, but rather use the department's established FII process.   The FII directive carries the authority and responsibility to ensure use of force investigations are completed per VIPD Policy and the Consent Decree.   The Work Group activity consumes personnel time and talent, which constrains work on other important VIPD police activity.  The FII along with the CCMU and its auditors are completely capable for ensuring compliance with VIPD Policy and the Consent Decree.

The IMT requested the VIPD to provide evidence of the FII's role as described in Commissioner's Directive 2018-006.  The VIPD provided a recent sample of the FII's work.  Most striking in the review, was the absent of accountability within the scope of the FIIs and their work as outlined in the Commissioner's Directive.   The evidence indicated a case, which the IMT assessed as having serious deficiencies – UOFT2019-0098, 0099.  The FII assessment did not mention any deficient areas as  required in the Directive and had the Use of Force Work Group review the incident.   The FII instructed the supervisor to re-draft disciplinary charges against the off-duty officer.  The CCMU and Deputy Chief reviewed the

incident and came to similar findings as the IMT.  Unfortunately, the FII did not assess the incident in a similar fashion.

Secondly, the reviews consisted of the FII indicating they notified a supervisor about a failure in completing an incident and status of an overdue investigation.  The FIIs do not indicate in their reviews any of the following as indicated in the Commissioner's Directive:

- o   Supervisors responding to the scene of a reportable use of force

- o   Reports submitted in a specified time frame

- o   Use of force is reported accurately and completely

The VIPD might not have their noted deficiencies and continual limitations for Paragraph 37, or as many, if they would simply operate within this existing Commissioner's Directive and follow the intent of the FII.  The VIPD in the last quarter implemented a similar process of accountability with the citizen complaint process and instituted the Citizen Complaint Inspector (CCI).  Designating a single-individual responsible for the overall review of important component parts of use of force and citizen complaints can and will have a positive impact on the VIPD.  If the VIPD would simply comport with the intent and merit of the FII, they should fare very well with VIPD Policy and Consent Decree requirements.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

## III.   <u>CITIZEN COMPLAINTS/MANAGEMENT & SUPERVISION</u>

### <u>Citizen Complains</u>

It is important to note that at the last court hearing (March 3, 2020) Judge Gomez orally stated the VIPD was out of compliance with the paragraphs identified as such by the IMT during the Fourth Quarter of 2019.

Prior to addressing the current quarter evaluation, IMT finds it important to explain our findings relative to Paragraph 46 dealing with the preponderance of the evidence standard.

Last Quarter, the IMT reported that we would continue to work with CCMU on Paragraph 46 and the IMT would report out status next quarter on that paragraph.  The update is shown in Table 5.  Also, as reported last quarter, rather than just coming to a definitive finding, the IMT continued to work with CCMU on Paragraph 46. The IMT believes these discussions are critical at this stage. With a shared understanding of how to assess/complete the Audit Form, the IMT will be able to reduce the number of investigations we review and rely more significantly on CCMU.  More importantly, VIPD (CCMU) will be left with skills to continue to use long-term.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**Table 5**
**4Q2019 Citizen Complaint References & Compliance Results – Updated**

| PARAGRAPH | DEFICIENCIES FOUND | COMPLIANCE RATE |
|---|---|---|
| 44 | 5 of 20 | 75% |
| 45 | 0 of 20 | 100% |
| 46 | 7 0f 20[8] | 65% |
| 47 | 0 of 20 | 100% |
| 48 | 0 of 20 | 100% |
| 49 | 0 of 20 | 100% |
| 51 | 15 of 20[9] | 25% |
| 52 | 4 of 20[10] | 80% |
| 54 | 7 of 20[11] | 65% |
| 55 | 1 of 20 | 95% |
| 56 | 5 of 20 | 75% |
| 57 | 7 0f 20 | 65% |
| 58 | 8 of 20 | 60% |

At the submission of the Fourth Quarterly Report of 2019, the IMT and CCMU agreed on three (3) cases which did not meet preponderance of evidence standards. We had conflicting findings on five (5) other cases. As a result of joint reviews and discussions this quarter, the IMT and CCMU now jointly agree that three (3) of these five (5) cases did not meet the preponderance of the evidence standard. The IMT and CCMU agreed that one (1) case of the five (5) does meet the standard; and IMT and CCMU now agree to disagree on the final case. This results in a Compliance Rate of 65% for paragraph 46 during the 4th Quarter review. (VIPD findings indicate a 70% Compliance Rate.) Based on this further review/discussion, in addition to Paragraphs 51, 54, 57 and 58 not maintaining compliance last quarter, Paragraph 46 did not maintain compliance. The findings/determinations of the audit process are shared by IMT and CCMU.

**A.  The Assessment Protocol for 1Q2020 Review**

---

[8] IMT identified 7; CCMU identified 6.
[9] IMT identified 16; CCMU identified 15.
[10] IMT identified 6; CCMU identified 5.
[11] IMT identified 8; CCMU identified 9.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

The IMT and CCMU have spent considerable time over the past year to develop a shared Audit Form and in reviewing our findings to find common ground and common understanding on Consent Decree compliance assessment.  The IMT has previously stated that we would reduce the number of cases reviewed as IMT and CCMU found similar assessments in our case reviews. During the Third Quarter 2019 there were substantial differences in assessment. These were discussed and resulted in the majority of our findings becoming consistent. Throughout this process, the IMT is not attempting to see 100% agreement; rather that CCMU present a clear understanding of the requirements of the Consent Decree. During the Fourth Quarter 2019, while there were still numerous initial differences in assessments, there were fewer than found in the prior Quarter. These were discussed and our assessments of compliance were largely consistent. Differences of opinion did not alter the subsequent Compliance Rates.

For this Quarter, the IMT reduced the sample to ten (10) investigations. For the first time, **there were three** (3) investigations where no deficiencies were identified.

The 10 cases requested and reviewed by the IMT and CCMU are:

| | |
|---|---|
| CCX2019-0078 | CCT2020-0002 |
| CCX2020-0001 | CCT2020-0004 |
| CCX2020-0002 | CCT2020-0005 |
| CCX2020-0004 | CCT2020-0006 |
| CCX2020-0005 | CCT2020-0012 |

Again, both the CCMU and IMT initially reviewed the ten (10) investigations independently – similar to the process last quarter.

## B.  <u>Summary of Findings</u>

Based on a review of these 10 cases, Paragraphs 46, 51, 54 and 57 continue to lack compliance. This is the third consecutive quarter that these four (4) paragraphs continue to not maintain compliance. Additionally, Paragraph 56 falls below acceptable compliance standards for the second consecutive quarter. Although paragraph 58 showed improvement this quarter – IMT will continue to monitor next quarter prior to changing compliance status. For the first time in three quarters Paragraph 55 has slipped to a precarious position. In summary, Paragraphs 46, 51, 54,

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

55, 56 and 57 fall below acceptable compliance standards this quarter. And 58 remains out of compliance until we assess a second quarter of improvement. Table 6 below displays the results.

**Table 6**
**Citizen Complaint References & Compliance Results – First Quarter 2020**

| PARAGRAPH | DEFICIENCIES FOUND | COMPLIANCE RATE |
|---|---|---|
| 44 | 1 of 10 | 90% |
| 45 | 0 of 10 | 100% |
| 46 | 3 of 10 | 70% |
| 47 | 0 of 10 | 100% |
| 48 | 0 of 10 | 100% |
| 49 | 0 of 10 | 100% |
| 51 | 4 of 10 | 60% |
| 52 | 1 of 10 | 90% |
| 54 | 4 of 10 | 60% |
| 55 | 3 of 10 | 70% |
| 56 | 3 of 10 | 70% |
| 57 | 4 of 10 | 60% |
| 58 | 2 of 10 | 80% |

The IMT recommends that Paragraphs 46, 51, 54,56, 57 and 58 continue to be considered as not compliant. The IMT will continue to monitor 58 to see if it continues to maintain an acceptable compliance rate prior to recommending a change in compliance status. Also, the IMT will continue to monitor Paragraph 55 prior to recommending a change in compliance status.

While the IMT had committed to reducing the numbers of cases to review as IMT and CCMU assessments become more aligned, the IMT intends to return to the sample number of twenty (20) cases as long as the VIPD continues to lack compliance in a number of Citizen Complaint CD paragraphs.

The IMT continues to applaud the efforts of the CCMU in this area.

A very important note is that while there were a limited number of differing opinions on the Audit Forms – through detailed discussions, these were resolved. At the conclusion, IMT and the VIPD (CCMU) were in agreement with the findings.

In order to better understand the nature of the discrepancies with the CD requirements, the following information is provided.

The preponderance of the evidence standard is not met when the finding is not supported by the standard; or when there is insufficient information contained within the file to appropriately apply the standard. (paragraph 46; CCT2020-0002; CCT2020-0012; CCX2020-0005). Violations of paragraph 54 this quarter include whether investigators considered all relevant evidence, are unbiased and/or resolve material inconsistencies. (CCT2020-0002; CCT2020-0006; CCT2020-0012; CCX2020-0005)

Violations of paragraph 55 this quarter was on whether the inquiry looked at all relevant police activity, including searches and seizures. (CCT2020-0002; CCT2020-0005; CCX2020-0005) Paragraph 56 requires that the complainant be periodically updated (if necessary) and receive notice of the final outcome of the investigation. (CCT2020-0002; CCT2020-0004; CCX2019-0078)

Paragraph 57 requires the identification of the appropriate disposition. Within these violations there were no instances where a case which should have been sustained was identified otherwise. However, it is still necessary for the investigators to understand the differences among exonerated, unfounded and not sustained. Otherwise, the complainant and officer would receive incorrect information about the outcome of their complaint. (CCT2020-0002; CCT2020-0006; CCT2020-0012; CCX2020-0005) At this point in the Consent Decree process, not having a clear understanding of these industry standard terms is troubling and should not be acceptable.

Violations of paragraph 58 this quarter were two instances of commanders not identifying underlying training needs. (CCT2020-0002; CCT2020-0004).

There have been a number of violations of paragraph 51. This quarter, these include inappropriate interrogations and not addressing all misconduct. IMT has chosen to highlight some details associated with paragraph 51 as they repeat every quarter and can have significant consequences. In two cases misconduct alleged was not addresses; in both cases, complainant

was discouraged from making a complaint. (CCT2020-0005; CCX2020-0005). Also, there were additional allegations uncovered which were not addressed and all witnesses were not interviewed (CCX2020-0005).

CCMU continues to provide details on Audit Forms which are helpful in understanding the deficiencies. In CCT2020-0002 Audit Form, CCMU detailed the following as paragraph 51 deficiencies: "Investigating supervisor asked Respondent Officer improper questions. Prior to the interview, investigating supervisor had Respondent Officer listen to a recording of incident taken by Complainant. During the interview, Investigating Supervisor referenced the recording and asked the Officer several questions, some of which were improper: Could your interaction with Complainant be interpreted as harassment? Was your (Officer) total interaction with Complainant within Department policy?" In CCT2020-0012 Audit Form CCMU documented "The examination and interrogation of Respondent Officer was not properly conducted. Investigating supervisor did not ask proper questions to elicit complete statements. Investigator did not utilize information provided by Complainant to potentially jog Respondent's memory of the alleged incident." Additionally, as noted by CCMU and IMT, the investigating supervisor then asked a number of yes/no questions; read Complaint and asked if Officer wanted to add anything (no); and concluded interview.

IMT and CCMU should discuss the details of these deficiencies if there were any differing opinions in the aforementioned cases.

**Management and Supervision**

**A.  IAPro**

The Independent Monitoring Team (IMT) continues to struggle with the limitations of IAPro within the VIPD and the VIPD's apparent lack of urgency in addressing this issue.

In order to advance this issue this quarter, the IMT prepared a Discussion Paper reflecting our assessment of the current status of IAPro. This was shared with DOJ and senior members of the VIPD along with a request for a meeting and subsequent written response from the Police Commissioner. The following is the content of this Discussion Paper.

### 1. IAPro Impact on the Consent Decree

A contemporary American police agency must rely on a database to capture essential elements pertaining to citizen complaints, use of force investigations, K9 bites, civil litigation, pursuits, injuries to prisoners, administrative investigations, and other risk management centered incidents.  The Virgin Islands Police Department (VIPD) to gain compliance with the Consent Decree requirements selected and has utilized IA Pro & Blue Team as their database to capture, document and store these risk-management incidents. Since 2015, the IMT has had remote access to this database to facilitate our review and monitoring.  The IAPro databases were, since implementation, two separate databases, one on each island (STT and STX). Thus territory wide data required blending of information from both databases. The Court placed the VIPD in substantial compliance in December 2018 presuming continued compliance with IAPro related Consent Decree paragraph requirements.

### 2.  Situation

The VIPD suffered a ransomware attack on both IAPro databases on April 22, 2019. Not only the operational databases but also the system backups were affected. Just prior to the attack, the IMT's remote access protocols no longer connected to the system and VIPD was notified. IMT and DOJ were notified by verbal statements after inquiries were made concerning IMT remote access just prior to the attack.

On May of 2019 IMT requested information from the VIPD on their plans for restoring the IAPro system back to its former status as well as IMT remote access. Between that date and January 2020, the VIPD and the IMT exchanged several memorandums regarding the plan and progress of re-establishing the IAPro system and IMT remote access. The Court was notified of the breach in a 05/21/19 filing.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

In a 07/23/19 VIPD filing with the Court "IAPro Setup & Recovery Plan, established the following which in part stated[12]:

- The NEW IAPro system would consist of two servers, a primary and alternate, with the primary hosted by Microsoft Azure services in the cloud and an onsite server that would be the backup.

- Contracts were being let for an automated secure cloud-based backup system that would be in place by September 2019.

- Department computers were being reformatted and reloaded and brought back on line by 09/30/19.

- An assessment of network security was scheduled for completion by mid-August 2019.

- Continued efforts with cyber-security specialist will be ongoing to recover the backup data from the prior system.

VIPD added on 07/31/19[13]:

- They have a summer intern who they intend to hire full time to enter case data into the system with the goal of five years back; e.g., or to 2015, which will meet the CD requirement of five years. They were attempting to seek data entry help from other VI agencies.

- The corrupted backups were stored off line at the Criminal Justice Center on STT and at the Rainbow Building on STX. No one other than the FBI attempted to UN-encrypt these backups.

- VIPD was using logbooks and spreadsheets along with paper case files to log data on cases occurring after the breach until the system was back up.

- Another attack occurred on 07/11/19 where malware or a virus (not ransomware) attacked several data components of the VIPD other than the IAPro system. It resulted from someone downloading a virus from an email.

IMT has been unable to access the new IAPro system since its establishment.

A 01/26/20 and 01/31/20 memorandums VIPD stated.[14]

---

[12] Dkt 402-1, 07/23/19, pages -2.

[13] Memo from VIPD Commissioner to the IM, 07/31/19, generally pages 2-3.

[14] Memo VIPD UT Director to D/Commissioner, Professional Standards, subject "IMT Remote Access, 01/26/20.

- Monitors will get remote access after the system assessment upgrades have been accomplished to the endpoint security hardware. In addition, a security plan will need to be established that will ensure that the devices only connect to the required data systems.

- The VIPD now stated its intention to only restore two years' worth of data or back to 2017[15], which does not meet current CD requirements.

- VIPD has one full time employee entering data into the system, as well as periodic assistance from a school crossing guard.[16]

- Provided a schedule of case input based on these resources that would input a total of 620 cases by September 2020.[17]

## B.  Conclusions and Status

Since the ransomware, the VIPD has struggled to bring back IAPro for various procurement and personnel reasons.  Despite assurances in the previous stated memoranda, the following is the status:

- They have unilaterally reduced the number of years of data they intend to maintain in the system from the required five years to two years.

- The current IAPro system severs are not on Microsoft Azure in the cloud as stated in their plan but rather are housed in one physical machine on STT despite their stated plan.

- There is no cloud based third party back-up system contract and no cloud backup as stated in their plan; backups are only being stored weekly within VI data centers, despite their stated plan to do so.

- To our knowledge, the system assessment and subsequent system-wide security system has not been developed or accomplished as stated in their plan and we have not been notified of any contracts for same.

- The slow pace of re-entry of the cases into the IAPro system does not seem to indicate a desire to accomplish this prior to meeting the Dec 2020 two-year deadline for compliance. On site review of data in IAPro by the MT validates this concern.

---

[15] Ibid, page 1.
[16] Ibid, page 1.
[17] Ibid, pages 2 an3; IMT calculated out the totals and estimated for a missing month. See IMT charts at the end of the paper that translates this into about 3- cases entered per day.

## C.  Current Limitations

- The VIPD is unable to track patterns without conducting a hand analysis.  Meaning, the VIPD has reduced capacity to accurately and properly assess any officers who are outliers in risk-management incidents – use of force, citizen complaints.

- Endpoint CD compliance status evaluation will be difficult without access to computerized historical data to support trend analysis in the various case, risk assessment, and training components of the CD.

- It is not clear how the VIPD manages the current EIP process, with only references made to use of spreadsheets.

- The timeline case management within IAPro is not being actively managed.  The IMT has assessed past incidents that were not being properly entered into the IAPro database.  For example, if a use of force incident is inputted into IAPro with an occurred and due date, but no opened date or assigned investigator, there is a void of accountability to actively track the case without manually viewing the activity timelines.

- The IMT is unable to actively access and view IAPro.  Thus, the IMT requests for data, files, and information are sent electronically to the IMT by the VIPD.  Our requests are often delayed by days until we receive the requested the information.  If the IMT had ready access to IAPro, we could obtain the data in a quicker manner that reduces workload impacts on the VIPD IAB.  This would allow an assessment and then dialogue with the VIPD in the event of the need for further discussions.  To date, the delays in data receipt and subsequent discussions is less than productive as they are pushed right up until the Court Evidentiary Hearing as note din our most recent quarterly report.

- The IMT also discovered the sent files from the VIPD in many cases do not contain all of the investigative materials.  The IMT has had to request additional files, which were not sent in the original batch.  This reflects a breakdown of the VIPD stated objectives that the paper files are backups to the IAPro system electronic files and meaning that both should mirror each other. The IMT has validated this finding by on-site monitoring of paper case files which contain documents that were not originally sent to the IMT or which are not found within the IAPro system.

All of the above information was provided to the VIPD in March 2020 in order to frame an opportunity for discussion to address IMT concerns.  Additionally, the IMT submitted the following list of "Requested Remedies" for VIPD to respond to in order to further the discussion.[18]

---

[18] IMT Discussion Paper, "IAPro Impact on the Consent Decree, undated but delivered to the Parties on 03/24/20.

D. **Requested Remedy**

- **"Identify the barrier(s) to fully restoring IAPro and Blue Team consistent with CD requirements, including detail on steps taken to mitigate at both the internal and external levels.**

- **Identify the timetable in restoring IAPro case files to CD requirements which includes the dates for progression and the validation and evaluation plan for accuracy and monitoring goal achievement.**

- **List the reason(s) as to why IAPro is not being restored in a timely manner or a manner consistent with previous stated plans?**

- **What barriers exist to prevent IMT remote access and what steps are being taken to mitigate those barriers?**

- **If recovery is out of the question before termination of the CD, explain what steps VIPD will take to ensure the monitoring team will have access to complete case data files on a timely and consistent basis."[19]**

In addition to the telephone discussion, the VIPD submitted a written response to the IMT. This response states that the VIPD continues to enter data as required and historical data also. In part, the VIPD response states "VIPD intends to enter all required fields into the system. We are still conducting audits to ensure  the cases entered contain all required information. VIPD has not completed the process of entering  all information and data."[20]

Additionally, in response to IMT queries on a backup solution, cloud infrastructure and remote access, the VIPD states, in part,

"The department has been working diligently in attempt to complete the contract process  to  begin  the  work  of  transforming  the  technology  environment  at  the department. The contract  will need to be completed to begin with the plans that were stated such as remote access, a backup solution and a cloud infrastructure. The department  relies  on  the  government  procurement  process  which  entails  other government agencies to play a role in the completion of  the contractual process. The

---

[19] Ibid, page 4.
[20] Memo, VIPD D/Commissioner for Professional Standards to VIPD Commissioner, 04/01/2020, page 1.

steps that need to be taken to overcome the remote access barriers  that were previously communicated are:

1.) The completion of the contract approval process
2.) The assessment of the infrastructure
3.) The implementation of a secure information technology infrastructure.
4.) Remote access can be provided after items 1-3 are completed.

There have been actionable steps taken on a weekly basis to ensure the required information  and documentation for the contractual process is delivered."[21]

This is the fifth quarter where the IMT has requested detailed information and a proposed schedule of actions to be taken in order to come back into compliance with Consent Decree paragraphs – specifically as it applies to IAPro. Over the past four quarters, the VIPD has submitted numerous memos and court filings listing possible solutions/steps the VIPD will take to address outstanding IAPro issues.  The IMT is unaware of the successful completion of any of VIPD's proposed resolutions.

In our most recent attempt to work with the VIPD to move efforts forward, many of our listed limitations and requested mitigation points were addressed in a very general fashion without sufficient detail or were not addressed. Once again, in the most recent VIPD response (attached) there is not one date mentioned for attaining completion of any step. There is also no indication of how many cases or pieces of data have been entered so far. The apparent lack of urgency to come back into compliance with CD requirements is not acceptable. This is not where the VIPD should be at this point.

At this time, the IMT respectfully repeats its recommendation that the VIPD is no longer in compliance with Paragraph 65 of the Consent Decree.

**E.  Early Intervention Program (EIP)**

---

[21] Ibid, page 2.

As part of the Early Intervention Program (EIP), an alert is sent to an individual's chain of command if they reach a threshold – which can be comprised of differing variables. Variables may be citizen complaints, uses of force, motor vehicle accidents, etc. For officers, the threshold is normally 4 in a rolling twelve-month period; although one serious incident could provide an alert. For supervisors, an alert is normally triggered if their personnel attain 8 incidents (collectively) within a rolling twelve-month period.

IMT was notified of three (3) alerts flagging one officer (EAX2020-0001) and two (2) sergeants (EAX2020-0002 and EAT2020-0001) for assessment and potential intervention during this quarter.

EAX2020-0002 proceeded in the usual fashion with some limited discussion and an action plan prepared based on the discussion.

EAT2020-0001 was noteworthy due to the fact that the information relative to which subordinates reported to the sergeant was not accurate. VIPD did work on cleaning up this information in order to gain compliance in 2018; IMT will continue to monitor to determine if the problem may be reemerging.

The meeting dealing with EAX2020-0001was of particular concern to IMT.  This meeting was comprised of the Deputy Chief, Lieutenant, Sergeant, involved officer, EIP analyst and three IMT members. The option to have the involved officer present during the discussion is optional for VIPD and usually does not occur; in this instance Officer A was present.

There ensued a lengthy discussion, primarily led by Lieutenant A as to why Officer A's actions were correct and should not be under review. When IMT pointed out that the allegations resulted in not sustained and sustained findings, Lieutenant A stated that the not sustained should be exonerated because Lieutenant A knows Officer A acted correctly. IMT could not ascertain any other factual data to support this.

As to the sustained charges, Lieutenant A described how the investigators findings were overturned from sustained to not sustained at a hearing because of new information being introduced at the hearing. Lieutenant A described this new information as a unique VI law

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

involving 'threats.' Lieutenant A description of this law did not make sense; Deputy Chief A supported Lieutenant A presentation. Both asserted that this law was the reason the charges were overturned at the hearing. On March 9, 2020 IMT requested a copy of this law, which Lieutenant and Deputy Chief A stated was introduced at the hearing. On April 20th IMT received a copy of a different law which was not part of the discussion. This was received from Lieutenant A. When IMT noted this was not the law referenced, a Captain A forwarded information which also did not pertain to the discussion or assertions made by Lieutenant and Deputy Chief A. At this time, IMT has not received a copy of this law; nor an explanation of actions which VIPD plans on taking to address the situation. IMT will update next quarter.

Most troubling throughout this discussion was how managers undermined the EIP process before a supervisor and the involved officer. While VIPD had made good progress during 2018 with EIP – there have been concerns noted during 2019 and 2020. This particular meeting was totally unacceptable. VIPD management identified that Lieutenant A needed to be spoken to; however, IMT has not heard of any other actions VIPD plans on for Lieutenant or Deputy Chief A. Minimally, IMT questions the level of training new supervisors and managers receive in conducting these meetings. Also concerning is what was presented as the reason for overturning the sustained charges at the hearing; IMT will follow up to understand the level of training new hearing officers have received.

EIP touches on multiple paragraphs within the CD. IMT will continue to work with VIPD in this area. In IMT assessment, VIPD is in danger of being recommended for non-compliance within the area of EIP unless improvement occurs.

Last quarter IMT had discussed multiple cases involving the same officer (Officer B). To get a fuller picture of the handling of Officer B in EIP, IMT will trace the EIP history. IMT requested all EIP materials associated with Officer B.

In April 2016 Officer B entered into a Last Chance Agreement with the VIPD involving use of force and other matters. In resolution of this case, Officer B agreed to serve a 30 day suspension, complete a Fitness for Duty assessment, undergo additional use of force training and was required to "follow all oral and written policies, procedures, directives…." According to the Last

Chance Agreement. There was no documentation on the Fitness for Duty or additional training provided to IMT. IMT will follow up again with this request. IMT will follow up as to why subsequent complaints within the two-year time period of the Agreement did not result in termination.

VIPD provided a memo, dated July 11, 2018 entitled "Remedial 'Customer Service Training' for Officer B as required by EIP recommendations."  This may be associated with EAX2017-0010 but the case number is not on the memo.

On August 13, 2018 a Summary of Employee Performance Report (SEPR) was completed on Officer B and forwarded as a alert to his command (EAX2018-0005). This included a listing of multiple citizen complaints against Officer B. The subsequent meeting resulted in an action plan dated September 19, 2018. The Action Plan was to "have a supervisor monitor Officer B while he is on restricted duties every week for a period of three months to observe his interactions with the public. Also, Officer B must undertake a Hospitality Training."  It should be noted that Officer B was on restricted duty pending the outcome of an Administrative and Criminal Investigation.

In addition to the Action Plan, Officer B's sergeant submitted an additional memo dated September 19, 2018 entitled 'Administrative Insight". Within this memo the sergeant states that "it is my opinion that Officer B need to receive some type of ongoing Professional Counselling to assist him with communicating with the public." The sergeant adds an additional note in his memo stating "In reviewing Officer B's file, it is clear that, the constant EIP alerts speaks to his Fitness for Duty and if this plan fails, we should look into a harsher remedy, since we are running out of options."

The Assessment Report for this intervention was completed in January 2019. The sergeant expresses his frustration in the Assessment Report that he has not heard of any additional measures scheduled for Officer B – which the sergeant reinforced as needed. No documentation of recommended training was provided in response to the IMT request. Nor was any information on counselling or Fitness for Duty evaluation (redacted when other Fitness for Duty evaluations have been previously provided).

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

On October 5, 2019 a SEPR was forwarded to Officer B command detailing multiple citizen complaints against Officer B involving two uses of force, a traffic stop and retaliation (EAX2019-0006). On 10/16/19 an alert meeting was held and an Action Plan discussed. The Action Plan recommendations included, amongst other recommendations, "request for psychological evaluation"; "change in duty assignment from a first responding officer to a support officer role'; "continued use of assigned body camera" and "supervisor monitoring for three months. The Assessment Report for this intervention (due at the beginning of this quarter (nor any supporting documentation) has been received by IMT.

As reported last quarter, in two cases reviewed (CCX2019-0050; 0060), Officer B had been assigned a body camera. IMT had been advised that this assignment of a body camera was, at least partially, based on his history of complaints. In neither of these cases was the fact that the camera was not on addressed by the investigator. Without being addressed in the investigation, there appears to have been no consequence to Officer B.

In a third case reviewed last quarter involving Officer B (CCX2019-0054) multiple charges were sustained in an investigation in December 2019. As a result of a hearing findings were sustained and a recommendation of a 63-day suspension was forwarded to the Police Commissioner. The PC held 33 days in abeyance and the officer was to serve the remaining 30 days of suspension in February 2020.

In subsequent conversation with IMT, PC and senior VIPD management discussed the appropriateness of the discipline – given Officer B's history. IMT opinion is that days are normally held in abeyance when the officer's misconduct is, an aberration, and the organization wishes to offer a reduction. The PC stated that he felt the 30-day suspension sends a strong message; additionally, the PC stated that he looks at the fullness of the violations, potential impact, gravity of discipline and felt the 30 days suffices.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

Given the history, and supervisors repeated requests for assistance with Officer B, IMT respectfully disagrees. As stated before, IMT will continue to be available to work with VIPD in this area.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

# IV.   TRAINING

As the First Quarter of 2020 drew to a close the VIPD was maintaining compliance with the primary Training related paragraphs as well as those sub-components of other paragraphs as noted in the report[22]. These paragraphs are noted in detail later in this report. However, this compliance was and continues to be further complicated by two major factors since our 1Q2019 report. The first was the ransomware attack on the IAPro Risk Management database as well as a subsequent virus attack on the entirety of the VIPD information infrastructure and operational systems. These attacks took place in April and May of 2019. In addition, beginning in February of 2020, the Territory and the rest of the US was struck with a coronavirus epidemic that turned into a pandemic (COVID-19), forcing the suspension of many traditional classroom-oriented training activities. Both of these unfortunate situations, one man-made and the second naturally induced, have forced the VIPD and its Training Bureau to rapidly alter their plans and seek alternative methods of training delivery in order to maintain compliance. To the extent physical and fiscal resources have allowed, they have been successful, but still require some follow-on activities once the two problems are resolved. Despite these challenges, they continue to exert substantial efforts to retain their compliance status, have sought out and implemented alternative solutions, and the IMT recommends to the Court that Substantial Compliance status for the Training activity noted in Consent Decree paragraphs 73-81 be continued in force.

The last comprehensive review of training occurred during the 1Q2019 reporting period and the purpose of this 1Q2020 assessment is to report on whether the VIPD is still complying with the training requirements of the CD and if not, what steps need to be taken to ensure compliance. While Training was not a specific focus in the 2Q2019, 3Q2019, or 4Q2019 reporting periods, major focus areas still requiring either re-occurring or developmental work by the VIPD was reported on in each of those quarters.  This reporting quarter, unfortunately, has been consumed with finding ways to respond and maintain compliance while still addressing the mitigation requirements of the severe virus COVID-19. This virus, as we know, has drastically adjusted the way in which we conduct ourselves and official operations of the VIPD.

---

[22] 1Q2019 Report of the Independent Monitor for the U.S. Virgin Islands Police Department, 05/17/19, pages 17-20.

In addition, starting in April 2019, the attacks on the VIPD's Information Systems infrastructure as well as a devastating attack on the IAPro system, which destroyed almost nine years of Risk Management Data, created management problems for the Training Bureau. As their internal information systems were taken down they lacked access to locally stored information such as Standard Operating Systems, lesson plans, administrative data, etc.  Their local laptops and desktops were shut down for reformatting, connections lost between operating units, and the Internet, including their records management data in PowerDMS.[23] Even simple exercises such as connecting to a printer became interdicted and frustrated curriculum development, records management, and the administrative function. Yet, as the reader will see later in this document, the Training Bureau maintained its forward motion and used whatever was available to maintain its compliance. For example, since they could not upload training attendance and testing results to PowerDMS, they kept comprehensive paper copies and as soon as the systems allowed, began an orderly sequential uploading of the records to PowerDMS.

Training, due to the requirement of groups receiving training, has had to adjust the delivery of the training as well to some degree the development of it.  To put it bluntly, training has been severely impacted by the social distancing guidelines and lack of facilities to conduct COVID-19 compliant traditional training delivery methods. In response the VIPD has turned to non-traditional training delivery options making full use of distant learning through its PowerDMS platform, as well implementing Microsoft TEAMS to support the remote training needs, as well reducing class size such as range firing to no more than five students. Examples of this alternative will be found in later portions of this chapter.

As we noted in our 1Q2019 report, the Consent Decree has a variety of training focus points throughout its content that include Use of Force related training from initial entry level, follow-on Field Training of the new recruits, continual roll call opportunities, group and specialized In-service Training, and the coordination of that with VIPD policies. In addition, there is attention placed on the need for initial and continued training in how to handle and investigate Citizen

---

[23] Connections were lost to the internet for at least two quarters but the data in PowerDMS was secure as it is stored in the cloud and protected.

Complaints. In order to accomplish these requirements, the CD also addresses how training is evaluated, managed and documented as well as how records of this training and the students that attend it are maintained. While CD Paragraphs 73-81 have traditionally been seen as the primary Training related requirements, other paragraphs across the CD require training activity in some form or the other. These paragraphs include 31, 35, 41, 46, 51, 52, 58, and 64. These paragraphs are detailed as follows:

*Para 31*
*The VIPD will review and revise its use of force policies as necessary to:*
*a. define terms clearly;*
*b. define force as that term is defined in this Agreement;*
*c. incorporate a use of force model that teaches disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements or calling in specialized units as appropriate responses to a situation;*
*d. advise that, whenever possible, individuals should be allowed to submit to arrest before force is used;*
*e. reinforce that the use of excessive force will subject officers to discipline, possible criminal prosecution, and/or civil liability;*
*f. ensure that sufficient less lethal alternatives are available to all patrol officers; and*
*g. explicitly prohibit the use of choke holds and similar carotid holds except where deadly force is authorized.*
*Once the DOJ has reviewed and approved these policies, the VIPD shall immediately implement any revisions.*

*Para 35*
*The VIPD will train all of its supervisors and officers assigned to conduct use of force investigations in conducting use of force investigations, including in the factors to consider when evaluating credibility.*

*Para 41*
*The VIPD shall continue its policy regarding the intermediate force device, incorporate the intermediate force device into the force continuum and train all officers in its use on an annual basis.*

*Para 46*
*Complaints will be evaluated based on a preponderance of the evidence standard, for which the Territory will develop and implement appropriate training.*

*Para 51*
*The VIPD will establish policies and procedures and train all of its investigators on the factors to consider when evaluating complainant or witness credibility; examination and interrogation of accused officers and other witnesses; identifying misconduct even if it is not specifically named in the complaint; and using the preponderance of the evidence standard as the appropriate burden of proof. VIPD investigators will ensure that all officers on the scene of an incident provide a statement regarding the incident.*

*Para 52*
*The policy will require that the investigative findings include whether: 1) the police action was in compliance with policy, training and legal standards, regardless of whether the complainant suffered harm; 2) the incident involved misconduct by any officer; 3) the use of different tactics should or could have been employed; 4) the incident indicates a need for additional training, counseling or other non-disciplinary corrective measures; and 5) the incident suggests that the VIPD should revise its policies, training, or tactics.*

*Para 58*

*Unit commanders will evaluate each investigation of an incident under their command to identify underlying problems and training needs. Any such problems or need will be relayed in the form of a recommendation to the appropriate VIPD entity.*

*Para 64*

*f. The protocol will require that intervention options include discussion by deputy chiefs, managers, supervisors, and officers; counseling; training; and supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system (appropriate intervention options will be employed based on the evaluation described in subsection (e) above).*

*Para 73*

*The VIPD will continue to coordinate and review all use of force policy and training to ensure quality, consistency, and compliance with applicable law and VIPD policy. The VIPD will conduct regular subsequent reviews, at least semi-annually.*

*Para 74*

*The Director of Training, either directly or through his/her designee(s), consistent with applicable law and VIPD policy will:*
*a. ensure the quality of all use of force training;*
*b. develop and implement use of force training curricula;*
*c. select and train VIPD officer trainers;*
*d. develop, implement, approve, and oversee all in-service training;*
*e. in conjunction with the Chiefs, develop, implement, approve, and oversee a patrol division roll call protocol designed to effectively inform officers of relevant changes in policies and procedures;*
*f. establish procedures for evaluating all training curricula and procedures; and*
*g. conduct regular needs assessments to ensure that use of force training is responsive to the knowledge, skills, and abilities of the officers being trained.*

*Para 75*

*The VIPD will continue to provide training consistent with VIPD policy, law, and proper police practices, and will ensure that only mandated objectives and approved lesson plans are taught by instructors. The VIPD will make best efforts to train each work shift as a team in their use of force training.*

*Para 76*

*The VIPD shall continue to keep adequate records of lesson plans and other training materials, such that the most current training documents are maintained in a central, commonly accessible file, and are clearly dated.*

*Para 77*

*The VIPD shall continue to maintain training records regarding every VIPD officer that reliably indicate the training each officer has received. The training records shall, at a minimum, include the course description and duration, curriculum, and instructor for each officer.*

*Para 78*

*The Training Director, in consultation with the Attorney General's Office, will review all use of force training and use of force policies on a regular basis to ensure compliance with applicable laws and VIPD policy.*

*Para 79*

*The VIPD will continue to provide all recruits, officers, supervisors, and managers with annual training on use of force. Such training will include and address the following topics:*
*a. the VIPD's use of force model, as described in this Agreement;*
*b. proper use of force decision-making;*
*c. the VIPD's use of force reporting requirements;*
*d. the Fourth Amendment and other constitutional requirements;*

*e. examples of scenarios faced by VIPD officers that illustrate proper use of force decision-making;*
*f. interactive exercises that emphasize proper use of force decision-making;*
*g. de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation even when the use of force would be legally justified;*
*h. threat assessment;*
*i. appropriate training on conflict management.*

<u>*Para 80*</u>
*The VIPD will continue to provide training to all its officers on the VIPD citizen complaint process. The VIPD will develop a protocol for all its officers on appropriate conduct and responses in handling citizens' complaints and will train officers in the protocol.*

<u>*Para 81*</u>
*The VIPD will provide training on appropriate burdens of proof to all supervisors, as well as the factors to consider when evaluating complainant or witness credibility (to ensure that their recommendations regarding dispositions are unbiased, uniform, and legally appropriate). The VIPD will also continue to provide training to supervisors on leadership and command accountability, including techniques designed to promote proper police practices. This training will be provided to all officers promoted to supervisory rank within 90 days of assuming supervisory responsibilities, and will be made part of annual in-service training.*

In addition, training references that respond to the above requirements can be found in just about any of the CD-related VIPD polices and/or Commissioner's Directives that have been generated since the CD was agreed to by the parties in 2009. Direct reference to policy creation can be found in many of the policies. These policies, responsive to Consent Decree compliance requirements, also required training activities of some type as well as form the basis for the content of many CD required lesson plans. Thus, the CD has been integrated across the VIPD's training programs.

In our 1Q2019 report we regrouped the common elements of the 17 Paragraphs previously mentioned into four (4) functional classifications for the purpose of monitoring and evaluating compliance. These are:

- Designing and developing training components **(31,35, 41, 51, 71, 72, 75, 78, 79, 80, 81)** ,
- Scheduling and delivering training to the field **(31, 35, 41, 51, 71, 72, 75, 78, 79, 80, 81)**,
- Evaluating training effectiveness **(52, 58, 64, 74)** , and
- Recording the training in the training management system (PowerDMS data system) **(76, 77).**...

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

These four areas contain a variety of activities that we monitor to determine compliance. Examples include, but are not limited to:

- Training operations associated with the development, delivery of group training, through either initial entry level or in-service training courses and products.
- Evaluation and modification of training products, deliveries, and instructor personnel.
- Development and delivery of Roll Call Training (RCT)
- Conduct of needs assessments as well as patterns and trends analysis of operational incidents to determine needs or revise existing training products.
- Ensuring that only approved lesson plans containing performance objectives, along with supporting curricula, are used to conduct departmental training
- Ensuring that approved curricula uses specific components such as VIPD incident-based scenarios that requires interactive decision making for the student, de-escalation options, and other tactics as spelled out in the CD
- That VIPD continually delivers training in specific areas of both Use of Force and Citizen Complaints.
- Ensuring the delivery of specific training for newly promoted supervisors
- Providing training that addresses the needs of manager and commanders.
- Ensuring that policies and procedures related to CD components are consistent with training products and deliveries.
- That VIPD adequately maintains records of training for department members, courses, curricula, and policy within the designated repository.

Each of these is linked to the other and is critical to the effectiveness of the training product. In the end, however, it is the totality of the training management that is critical and subject to evaluation for both compliance and more importantly success.


These four training areas are viewed from differing groups of student participation or focus areas. On an annual basis, the VIPD could conduct or be involved in any of the following:

- Entry Level (Recruit) Training (ELT)
- In-Service Training (IST)
- Supervisor Training (SUP)
- Management Training (MGT) (Added this quarter)
- Individual or Specialized Unit (SPU)
- Roll Call Training (RCT)
- Firearms Training (FAT)
- Recertification Training (Firearms and Less Lethal Weapons [LLR]

Additionally, IMT monitors two other areas related to Training:

- Training Advisory Committee operations (TAC)
- Field Training Officer Program (FTO)

IMT made an assessment of each of the four main areas and all of the student focus groupings in our 1Q2019 Report. Some of these were updated or modified in each of the subsequent reports and for the 1Q2020 report we evaluated our original assessments against current status and determined if the recommendations were effective in maintaining compliance. The assessment herein, however, is focused not only on current compliance but an evaluation of the department's ability to continue supporting Constitutional policing after the CD concludes, specifically within the Training environment.

To demonstrate current operations, a few observations are needed regarding how the VIPD training functions have developed and matured in the four quarters since our initial status report in 1Q2019. On the Entry Level area, lesson plans and associated policies are continually reviewed in accordance with CD requirements, with any lesson plans associated with an updated policy reviewed and updated.  This is accomplished by the Training Advisory Committee (TAC) and the operation of that committee has matured and demonstrated more flexibility in looking at all training needs not just those of the CD. As required by its governing policy, the Committee has met every quarter and extensive reports are generated from the meetings. The meeting for 1Q2020 was scheduled for 04/30/20 and conducted in a professional manner by the VIPD. A copy of the agenda is found at Appendix B to this report. This fact alone indicates management development within the Training Bureau staff.

Lesson plans for the Less Lethal Weapons, developed for Entry Level, have been modified for use in In-Service session recertification activities. Similar modifications have been made to Firearms Training, which has been further divided into Re-Certification Training (where Use of Force policy requirements are reiterated) and Firearm Qualification, which is just the actual firing requirement. Both sets include adult learning opportunities.

With the identification of specific training needs in the area of Citizen Complaints, the Training Bureau developed specific curricula focused at the needs of the investigating supervisor as well

as additional curricula refocused on the manager/reviewer of the investigations. These were the first steps to separate training for these groups, which had previously been lumped in with the officers during normal In-Service Training sessions. IMT sat in on the Supervisor level delivery and it was done well. The Manager/Reviewer version was scheduled for delivery in March but the COVID-19 social distancing requirements forced a transition to distance learning using PowerDMS, where it was recently completed in both districts.

Roll Call training was scheduled throughout the four quarters.

The Field Training Officer program was another identified issue in our reports and the Training Bureau, while not having full control or responsibility for its execution, conducted a review of the policy, ensured FTOs were retrained and managed a full review and updating of the policy, which at the time of this report is awaiting signature by the Commissioner. This is Another example of accepting responsibility and moving the ball forward.

## Current Status

When we issued our 1Q2019 report we made assessments of each of the areas as well as recommendations where additional work was needed to further improve compliance.

## A.  Design and Development of Training (35, 41, 51, 71, 72, 75, 78, 79, 80, 81)

The VIPD designs and develops a variety of training courses and individual blocks of instruction, many directed at different audiences and which although bearing similar names, in actuality have differing focus, content, and duration.  Each requires a different lesson plan(s) and supporting materials, although it is acknowledged that there can be modifications of other materials tailored to the needs of the new target audiences.

### 1.  Entry Level Training (ELT) Curricula Reviews

As we noted in the 1Q2019 report, much of the developmental area here was completed prior to that reporting period. Continual review and any subsequent updates have been accomplished using the Training Advisory Committee review process as well as input

from the IAB database (IAPro). Additionally, CCMU staff sits on the TAC and provides input from their review of cases and other risk management protocols and the VIPD's curricula in this area remains current and compliant.

In previous quarterly reports we have noted some ELT training blocks gleaned from the VIPOST mandates and VIPD schedules that quite possibly have CD ramifications and as such we have requested review of these. VIPD has provided most of these lesson plans and we have reviewed and commented where appropriate. We encouraged VIPD to review all ELT lesson plans, regardless of direct CD reference, for compliance with policies and update as necessary. As the bulk of those formally identified to the VIPD as direct CD-required were current, we deemed this area compliant. We found that many of these were developed many years ago and lack adult learning approaches as found in more recent blocks. We believe a comprehensive review would be in the best interest of the VIPD to reduce any redundant material and transition all courses to more adult focused format.

> **Assessment:**  Previously developed and reviewed ELT curricula mandated by the CD, are posted to the department's PowerDMS cloud-based platform. We find the required reviews and updates being accomplished and thus this area is compliant with the CD.

> **Recommendations:**

> - Conduct the review of all ELT material to ensure there is no redundancy and they are consistent in content as appropriate.

> - In conjunction with VIPOST, conduct a Job Task Analysis (JTA) to ensure the right subject matter is being delivered in the appropriate number of hours.

## 2.  In-Service Training (IST) Curricula Reviews

Our review efforts this quarter as well as over the past several quarters have been more focused on the area of In-Service Training and both Supervisory and Management level instructional initiatives. VIPD did develop IST in 2018 and conducted same. As it was classroom oriented and based on previous year's content and organization, the

interdiction of the department's computer systems did little to interrupt it. The version delivered in 2019 was similar in content to 2018, with the exception of updated policy reviews and some additional material on the handling of mentally challenged persons. Thus, there was little curricula development conducted.

The department continues to use the Street Smarts VR, 3-D Virtual Reality system that was donated by the manufacturer in 2018, although they have not updated any of the scenarios built into it. It consists of animated (life like renditions of humans) moving in law enforcement contact scenarios that are viewed by the trainee through a set of 3D goggles that reflect a 360-degree environment.

An iteration of In-Service Training was delivered in March 2019.  IMT reviewed the curricula and provided VIPD with comments for strengthening it from an adult learning perspective. The material was consistent with CD requirements. The Use of Force Workgroup provided input for updating lesson plans during mid-summer of 2019.  There continue to be more lesson plans developed than just PowerPoints, although they remain in the same delivery option of choice by the VIPD. Even with the focus on Power Points there remain many options for the VIPD to integrate more adult leaning options through interactive group feedback sessions or practical exercises.

A weak point in most all VIPD developed training is production of detailed practical exercise instructions. While the exercises are generally identified in either the lesson plan or the Power Point, there are generally no appendices or lesson body instructions for the conduct or evaluation of student success. While IMT is starting to see this accomplished in some recent versions, VIPD would benefit by increasing this process in all areas. This is especially important in situations where the instructor is not the author of the lesson plan.

Course components included the subject areas shown in Table 7:

**Table 7**
**2019 Part I In-Service Training (IST)**

| Subject Area | Hours |
|---|---|
| Legal Updates | 4 |
| Policy Updates | 3 |
| Domestic Violence | 7 |
| Use of Force | 4 |
| De-Escalation / Crisis Intervention | 3 |
| Total | 21 |

Legal Updates was taught by a VI AAG, while the remainder of the sessions were taught by VIPD personnel. The second session of IST, conducted in the Fall, consisted of Firearms re-qualification using previously approved curricula.

Progress of the Training Bureau is easily seen with the development of curricula during the latter part of 2019 and into 2020 where we have seen more use of VIPD specific cases and situational practical exercises. This was seen in both Use of Force and Citizen Complaint related materials. IMT compliments VIPD in making better use of IAPro, Use of Force Workgroup, and CCMU case materials to reinforce training content, as required by the CD. This was seen in both group and individual instructional efforts during the reporting period.

> **Assessment:**  IMT found the materials developed compliant with CD requirements, but suggests that they could use additional adult learning options and expanded use of VIPD specific cases and situations in the practical exercises.

### 3. Supervisory Training (SUP) Curricula Review

IMT had previously suggested that VIPD begin to develop and subsequently deliver IST directed at Supervisors and Managers. Issues related to compliance problems with the investigation of Citizen Complaints, generated development of course to address these problems in the fall of 2019. This was also an opportunity for the VIPD to increase its use of adult learning concepts.

VIPD developed this lesson plan and incorporated adult learning options as well as actual VIPD cases in late 2019. The lesson plan was reviewed and commented on by IMT and

met CD requirements. While VIPD does have a New Supervisor training package and continues to utilize it when needed, this effort was the first step for the VIPD toward a broad and comprehensive Supervisor-focused training curricula for existing supervisors as an In-Service focused activity. In addition, IMT had noted and VIPD agreed that a similar course focused on Use of Force investigations was also needed and that course remains under construction.

> **Recommendations:** VIPD should expedite the development and delivery of the Use of Force Supervisor training noted above.

## 4. <u>Management Training Review</u>

In most cases, VIPD managers receive their training from external sources. With the issues related to compliance issues with Citizen Complaint investigations and the development of the Supervisor focused training noted previously, it was evident to both the IMT and VIPD that they needed a version of this supervisor training refocused to the reviewer role of the commander or manager. VIPD developed the curricula in early 2020 and IMT reviewed and commented on it. We found it compliant with CD requirements.

This Manager focused version was designed, like the Supervisor-level version, as a classroom delivered product and scheduled for delivery in March 2020.  However, the Covid-19 pandemic prevented it being delivered and forced the VIPD to redesign it for the PowerDMS distance learning platform and it is expected to be released in May 2020.

> **Assessment:**  This is a new area for the Training Bureau and IMT commends them for initiating it. The materials developed met CD requirements and were comprehensive. They used VIPD case materials for the practical exercises. IMT did find the development and descriptions of how to conduct the practical exercises lacking detail and would encourage them to expand them in the future.
>
> **Recommendations:**
>
> - VIPD should develop a similar manager level focused course for review of Use of Force investigations to address the Paragraph 37 compliance issues.

5. **Special Unit Training Review**

VIPD contracted for development of a refresher course for members of the Force Review Board (FRB) and the Force Investigation Teams (FIT) as many members were newly assigned and had never received the initial training. The Virgin Islands Public Safety Foundation funded and contracted for the course development. IMT provided those developers with copies of the original curricula developed by the IMT in 2016 and assisted as needed. The materials were provided to the IMT concurrent with delivery and IMT reviewed same and determined they were consistent with the CD and VIPD policy.

> **Assessment:** The training was well developed and met both CD and VIPD policy requirements. As IMT has noticed some issues with conduct of the FRB reviews, it was essential that this training be provided those who were new to the system. Including a FIT refresher was also appropriate as most members were new and had never received the initial training. IMT will review future FRB operations for impact.

> **Recommendations:** None

6. **Individual or Other Training Review**

The Training Bureau hosts training from external sources as well as commercial training resources and other private training providers. Personnel also attend professional organization annual meetings and special training opportunities such as IAPro, PowerDMS, AELE, and others. Examples are PowerDMS providing program functioning training and the International Association of Chiefs of Police (IACP) and supporting stateside law enforcement agencies, conducting Part II In-Service Training for 2018.

While the IMT is able to review course outlines or Programs of Instruction (POI) for VIPD internal training, it is limited in its ability to review external agency POIs as in most cases all that is provided is brief outline of the training subject that is devoid of any performance objectives while in other cases there are reasonable descriptions of the overall course goals or Terminal Performance Objective (TPO).  IMT does try to attend some of these courses to assess applicability to the CD as well as compliance with it.

The most recent example of this type of training was attendance of several Training Bureau staff at the PowerDMS conference in Orlando, FL during early March 2020. This allowed them to receive updated training on the PowerDMS system as well as meet and exchange information with other users. Training Bureau reports it was very valuable and several excellent contacts were made with experience in using the platform for distance learning.

> **Assessment:**  VIPD's use of outside sources for training is generally compliant with CD requirements with the exception that it is usually not specific to VIPD policies. IMT has commented where appropriate and made suggestions for improvement as needed. IMT believes the VIPD acts in a CD compliant manner with these outside opportunities.

> **Recommendations:**

> - VIPD should obtain, if possible, detailed materials from outside training opportunities that depict the Terminal Performance Objectives for the course. This will allow VIPD to review the materials and determine if appropriate to their needs as well as perform a cursory compliance check.

> - VIPD should consider creating a library of training materials from these individual and outside training opportunities for use by training staff and as a reference bank for VIPD personnel.

## 7.  Roll Call Training Curricula Reviews

The VIPD over years has struggled to develop and deliver Roll Call Training. Most of the problems were associated with getting the Chiefs and Deputy Chiefs to be involved in the course subject area identification. While the Training Advisory Committee was structured to interface Operations with Training to accomplish this, previous meetings were not effective. Since late 2018 the Training Bureau has constantly improved the agendas and materials for review by the TAC and thus more Operations involvement has developed, with 2020 appearing to be the best iteration to date. Once subject areas are identified, Training will either modify previous classroom curricula or develop a new block of instruction. These are constructed for distance learning via the PowerDMS platform and generally consist of a Power Point, possibly a handout, and test. Recently videos of actual instruction have been added to the packages. These packages are then

listed in a six-month schedule and delivered via the cloud-based platform. The most recent product was on Vehicular Pursuit.

A six-month schedule was developed in 2019, with nine blocks of instruction. This list was provided in our 1Q2019 report. However, the attack on the department's computer system interdicted full delivery or in some cases delayed delivery of the scheduled courses. A new six-month schedule was produced in early 2019 and is depicted in Table 8 below. The subjects listed are available for one month and Training tracks data to ensure all required personnel participate. Lists of non-participants are forwarded to commanders who respond back as to the reasons for non-participation and an expected date for the personnel to complete the training.

IMT has reviewed some of the materials and spot checked for recordation of the training and subject testing in the PowerDMS system and found it compliant with CD requirements.

**Table 8**
**Current Roll Call Training Subject Areas**

| Period | Subject Area | PDMS[24] | Target Audience | Delivered By |
|---|---|---|---|---|
| Feb 2020 | Authorization and Restriction in Using the CEW<br>Supervisory Role in Responding to UOF Incidents | Curricula Responses | All Sworn | Via PowerDMS |
| March 2020 | Vehicle Pursuit Authorizations | Curricula Responses | All Sworn | Via PowerDMS |
| April 2020 | Recording Policing Activity Policy 3.24 | Curricula Responses | All | Via PowerDMS |
| May 2020 | Reportable Use of Force | Curricula | All | Via PowerDMS |
| June 2020 | Levels of Force | Curricula | All | Via PowerDMS |
| July 2020 | Use of OC | None | All | Via PowerDMS |

[25]

**Assessment:** IMT considered the process for identification of subject areas and the materials developed to be consistent with requirements of the CD.

## 8. Firearms Training Curricula Reviews

VIPD has developed three different lesson plans to cover Firearms training of the handgun and shotgun. We discussed these in our 1Q2019 report and are described in Table 9, below.

---

[24] IMT located curricula and/or completion results by Operations personnel taking the course in the PowerDMS system.
[25] Doc 442-2, VIPD Court Filing, 02/21/20.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

**Table 9**
**Firearms Related Lesson Plans**

| Lesson Plan Title | Hours | Description | Conducted By | IMT Reviewed |
|---|---|---|---|---|
| Basic Firearms (ELT) | 80 | This is the initial training provided to all recruits and includes UOF and skill training in firearm deployment and use, followed by qualification firing. | Training Bureau Staff | Yes; revised 2019 |
| Firearms Re-Certification | 8 | This includes a refresher on UOF issues om deployment and use, skill training, and requalification firing; generally conducted in the spring of each year | Training Bureau Staff | Pending; developed 2019 |
| Firearms Requalification | 2 | This is re-qualification firing only; no UOF instruction; generally conducted in the fall of each year. | Training Bureau Staff | Yes; developed 2019 |
| Rifle Requalification | 4 | This is qualification firing; only applies to those personnel authorized or have requested to carry the patrol rifle issued by the VIPD. | Training Bureau Staff | No |
| Special Weapons[26] | Unknown | Apparently conducted in concert with SOD training; recent interaction with SOD indicates dramatically reduced staffing and thus no training has been conducted due to limited team membership for over 1.5 years; includes long guns, machine guns, and several 45 caliber handguns on each island used by SOD for search warrant and other forced entry actions. | SOD | No |

These lesson plans were reviewed as needed and no changes have been made. IMT considers them consistent with CD requirements but notes the continuing problems associated with the SOD training materials as referenced in our previous reports. Training does not conduct these training efforts and only records completion when presented with documentation from SOD. It is also noted that SOD has suffered from low staffing in the SRT area and conducts its own training or attends outside provided courses. IMT visited with the SOD commander in late 2019 and encouraged delivery of supporting training documentation for their personnel to Training and we subsequently found same recorded in the PowerDMS system. However, lesson plans are not filed there and IMT encourages SOD to do so for compliance review against general Use of Force requirements.

---

[26] IMT has not identified any records of this qualification firing and may be maintained by SOD; in 2019 meeting with SOD command staff IMT requested copies of lesson plans or records but as yet has not received any.

**Assessment:**  VIPD Training Bureau is keeping up with their responsibilities for updating firearms related curricula, as well as the development and updates to associated lesson plans with the exception of the rifle requalification curricula.

**Recommendations:**

- SOD must forward and Training upload, a SOD curricula to the PowerDMS platform.

- VIPD should develop curricula for the long rifle training, both basic and re-certification.

## 9.  Less Lethal Weapon Re-Certification Reviews

As part of the development of the Less Lethal Weapons Use of Force ELT lesson plans in 2017, it became apparent that IST versions would be needed for two reasons. The first that the attendees are seasoned officers who have received the training before and this is just a refresher and/or re-certification that they still possess the skills to decide to and actually operate the weapons or execute the movements associated (e.g., in the case of Defensive Tactics). And secondly, there is not enough scheduled time available to conduct the full ELT version of the lesson plan. VIPD developed re-certification versions for all four of the Less Lethal Weapons (Impact or Baton, OC Spray, CEW or TASER, and Defensive Tactics) and did conduct some re-certification classes on both islands with training completed in November 2018. The lesson plans were reviewed and updated with both policy changes and identified errors or weaknesses throughout 2019 using the TAC protocol.

IMT suggested that the VIPD use a combination of distance learning via PowerDMS coupled with on-site training at one of their facilities to accomplish these recertification training sessions. For example, a distance-learning PowerDMS segment could discuss the legal or use of force issues related to the specific weapon being recertified in an interactive lecture format that used short discussions followed by testing questions. The skill side would be conducted in an on-site setting where only the skills were discussed. Attendees would have to complete the distance portion first and then the skills, with

session testing via PowerDMS at the end. Some flexibility with this process, given that it was new, was to be expected.

VIPD began working on this approach in 2019 and the COVID-19 situation has expedited that development in 2020 and VIPD plans to field it during mid-2020 to accomplish all but the physical skill portions. For example, they requested and the Commissioner approved a 60-day delay in conducting the cartridge discharge portion of the CEW re-certification training and the VIPD is still developing the lesson plans and related curricula, which IMT will review and comment on. To date IMT has reviewed Re-Certification curricula for Impact Weapons and Firearms. In both cases the VIPD made a good start and IMT provided feedback in writing and in person while on-site on STT during our most recent monitoring trip in early March, 2020.  As the review noted under ELT as other potential CD-related blocks of instruction are completed, VIPD will need to assess the need for development of any In-Service Training related versions may be required.

> **Assessment:**   VIPD continues to develop in this area, especially in terms of distance learning and adult learning options. They are reviewed like other curricula by the TAC on a quarterly basis. As VIPD experiments more with the PowerDMS and Teams platforms it can be expected that more development will take place. What has already been done meets CD requirements.

## 8.  Role of the Training Advisory Committee

The Training Advisory Committee (TAC) was selected by the VIPD in 2013 as their entity for conducting reviews of training curricula and related polices in response to CD requirements. The TAC itself does not develop any curricula or policies but rather review them in context with current IAPro case data and makes recommendations from the supervisory review, Workgroup report or CCMU. The CCMU participates in the meetings as do VIPD Operations personnel as described in the controlling VIPD directives. The effort put into the agendas and supporting material, as well the management of the meetings by the Training Director, has contributed to the overall success of the protocol. IMT sits in on these meetings and more than once has heard the Training Director and/or the Deputy Commissioner for Professional Standards take

positive stands   about the CD by reinforcing that it is their policies that they are following. We applaud their leadership.

> **Assessment:**  The Training Bureau continues to effectively use the TAC protocol for the review of curricula and associated policies. The scope and thoroughness of the agenda packages contributes to this result as does the attitudes and leadership of the Training Director in supporting the goals and objectives of the CD in general.

> **Recommendations:** None

### 9. Field Training and Evaluation Program (FTEP) (VIPD terminology) or Field Training Officer (FTO) Program

The FTEP program is a joint operation between the Training Bureau and Operations, thus it has two masters. The FTEP program is modeled on an industry standard program commandingly known as the Field Training Officer (FTO) program. It is an extension of Entry Level Training that ensures reinforcement training of the subjects, many of which are Consent Decree related, taught in the Entry Level Training program (recruit). Aside from Policy 10.2 Field Training and Evaluation Program (FTEP) and a set of manuals that have not been updated since inception, little attention had been placed on the program and the number of assigned Field Training Officers (FTOs) had dwindled. Beginning in the 1Q2019, the Training Director initiated a review, using the TAC, of the FTEP program and its supporting materials. The result is a revised directive that is awaiting the Commissioner's signature. In addition, updates were completed to the FTO training materials used to certify FTOs during the reporting period since 1Q2019. While initial response from Operations was spotty, over the last three TAC meetings interest picked up and the needed changes were developed and put into the revised directives.

In addition, re-certification training curricula were developed for former FTOs as well as new ones. The new material includes content from the revised policy so that no re-training will be necessary once the new policy is signed and published.

> **Assessment:**  The protocols and policy have been updated and it now remains a function of Operations, where the FTOs are assigned, to complete the observation

forms and submit them to Training. IMT believes the revised products met CD requirements and will monitor the Operations reporting as required by the policy, to ensure transitional reinforcement training of the CD covered in the ELT training blocks are consistent with the approved lesson plans.

**Recommendations:** Operations must increase oversight to ensure appropriate execution of the FTEP protocols for their personnel. These reporting documents must be forwarded to Training for appropriate records management disposition.

## B.  Scheduling and Delivery of Training (35, 41, 51, 71, 72, 75, 78, 79, 80, 81)

This schedule contains a variety of training programs as noted in Section B to this Chapter. Here IMT monitors how well the training developed is actually delivered. This component is composed of the functions of establishing a schedule for a course or mix of blocks of instruction and then following it (ELT and IST). It can also be the conduct of a stand-alone block of instruction that is designed to enhance an individual's career development or a unit's proficiency. Other examples are the annual re-certifications in firearms and less lethal weapons or the special courses responsive to identified compliance needs. Thus, the curricula are developed and monitored under the previous section A and the delivery here in Section B.

As previously noted when discussing the development of training, both the disruption to the department's information systems infrastructure and IAPro ransomware attack in April 2019, coupled with the current COVID-19 problems have significantly interdicted the delivery of training across the board and may well do so for the rest of the summer. Alternatives to classroom instruction using cloud-based platforms have now taken center stage.

### 1.  Entry Level Delivery Reviews

As we have noted in previous reports, VIPD still struggles with the constant changing of Entry Level Training Schedules. IMT has thus found it difficult to monitor selected CD related ELT classes, despite having the published schedule. These changes are for the most part related to problems beyond the Training Bureau's ability to manage as they are resultant of field instructors who do not show up for their assigned training periods or notify the Training Bureau of conflicts at the last minute. IMT previously met with the Deputy Commissioner for Operations as well as the Commissioner and stressed the need

for Operations Bureau cooperation in supplying the field instructors necessary to deliver the department's training programs. Given the small staff at Training it is imperative to have outside instructor capacity. This is not a new issue as IMT has observed it and discussed with the Training Director on numerous occasions in the past.

Training programs for Entry Level were conducted on STT and STX starting in 2019 and continue during 2020.  These classes were based on the POST approved course curricula and hours assigned to the various blocks. The ELT curriculum is partially controlled by the VI Peace Officers Standards and Training Commission (VIPOST) who establishes the minimum standards and to which VIPD should then be able to add any agency specific lessons.

VIPD is currently conducting its ELT course using distance learning options such as PowerDMS and Microsoft Teams. Students attend classes via computers from home and are supported with copies of the Power Point packages and handouts. They take tests via PowerDMS and Training has instituted more frequent testing given the remote learning environment. The computer virtual sessions do allow the students to interact with the instructor as well.  IMT had previously sat in on the classroom training and intends to sit in on the virtual formats in 2Q2020.

Those portions of the ELT that require physical interaction of the students will be delayed until the COVID-19 situation allows such interaction. Some steps are being taken to accommodate some physical activity such as the firearms component where they have limited the number of students to five per range to effect social distancing.

**Assessment:**  VIPD continues to deliver the ELT courses via virtual sessions and uses curricula that are complaint with the CD. IMT believes they remain in compliance for the ELT portions. IMT also commends the VIPD for its quick adoption of the virtual training and its effective use.

**Recommendations:** Post the revised virtual lesson plans, if any, to the PowerDMS platform.

### 2. **In-Service Training Delivery Reviews**

VIPD conducted two In-Service Training sessions during 2019 and scheduled a third class to start in March 2020. However, the COVID-19 issues prevented in-class delivery and the VIPD has resorted to distance learning techniques using the PowerDMS platform and Microsoft Teams. VIPD generally conducts the In Service in two sessions, one in the spring and one in the fall. The fall version is essentially the annual firearms qualifications, while the spring version is generally classroom oriented on a variety of subjects, including the CD-mandated ones. VIPD will follow that protocol this year also.

They may deliver some of the training using the Teams platform where an instructor delivers the class to an empty room while the students watch and interact live via their own computers. In other classes they plan to use the PowerDMS platform where they supply a video of the class, supporting curricula such as Power Points and handouts, with testing accomplished via PowerDMS. The In-Service Training may also include any updates to VIPD policy that occurred since the previous sessions. IMT has sat in on the classroom deliveries and found that material well organized and presented professionally as well as meeting CD requirements. IMT intends to sit in on some of the distance learning deliveries during the next quarter. As per our assessment and recommendations in the 1Q2019 report, VIPD has been providing the scheduling and curricula in a timely manner since 1Q2019. Issues found then and noted in reports have been rectified by the Training Bureau.

VIPD conducted traditional IST classroom and firearms training for Part I in early 2020 with STT completed and STX still pending firearms as there were issues with the STX range facility availability.

> **Assessment:**  Overall VIPD has increased its attention to the IST function and delivered some well thought out training. By using the TAC review process as well as CCMU data analysis from audits, they can build on this to broaden the subject area and delivery options, to include serious consideration of expanded distance learning via PowerDMS. Some efforts to do so are being seen in the RCT area and the same concepts can be used with IST. IMT believes that despite the

disruptions, VIPD continues to meet CD requirements for specific instructional blocks within the IST system.

**Recommendations:**  None

### 3. Supervisory Training Delivery Reviews

VIPD reused curricula from the 2018 New Supervisor's Course for a delivery in 2019. In the Fall of 2019, IMT and VIPD identified serious issues with compliance in the area of Citizen Complaint investigations. Concurrently IMT had been recommending that VIPD create separate IST training focused specifically at Supervisors, who previously had received joint training with officers on material that did not differentiate between ranks. The VIPD responded with a decision to create and deliver training to supervisors, who are responsible for the majority of the investigations of Citizen Complaints. The Training Bureau developed this course and it was delivered in December 2019 and January 2020. Some make-up training continues for personnel who were on extended leave at the time of delivery.

IMT has suggested some modifications to the training that will make it more interactive including more practical exercises and small group activity, as well as possible modifications to content, including use of VIPD specific cases. Those comments, along with some from the USDOJ, were incorporated into the final version by the VIPD. As the Training Bureau had included some cases in other issue specific deliveries, these were included in the Citizen Complaint version.

IMT notes that VIPD has been integrating more VIPD incidents as examples in the various training programs for supervisors and again continues to recommend that VIPD develop additional separate supervisor-only subjects as part of its IST. The use of PowerDMS's distance learning (remote access to audio visual supported training modules) and that of Microsoft Team or Google's Zoom, all offer excellent opportunities in which to accomplish this. The currently available RCT modules are other examples of how to deliver this supervisor focused training via virtual environments

Based on the completion of the Citizen Complaint supervisor training IMT will be reviewing its impact on actual Citizen Complaint investigations in the coming months.

IMT had advocated for a similar course covering supervisor focused material on the investigation of Use of Force cases. As with the current version, the IAPro system, CCMU and IMT evaluations, coupled with deficiency letter mark a vast trove of actual VIPD case materials that could be used similar to how it was in the Citizen Complaint area. VIPD advises that course is under design and IMT looks forward to an expedited completion to address Paragraph 37 compliance issues among others.

> **Assessment:** The current curriculum meets CD requirements and IMT believes that a similar one for Use of Force can be an easy extrapolation. Given the COVID-19 issues VIPD continues to meet the challenge and deliver products supporting operational performance.

> **Recommendations:**
>
> - Expedite the development and delivery of the supervisor focused Use of Force course dealing with the conduct of those investigations.
>
> - Continue exploiting use of actual VIPD cases as practical exercises.

### 4. **Manager Focused Training Programs**

IMT had suggested previously that VIPD include in it training programs new courses associated with management level personnel. In the past, most manager-level training was individual and externally provided. But managers also attended the traditional IST courses, which were not directed specifically at them. The problems associated with the Citizen Complaint investigation compliance presented a perfect opportunity to experiment with manager directed training. The VIPD utilized the previously developed supervisor-focused, Citizen Complaint investigation training and modified it to focus on the reviewer or manager. That training was scheduled for delivery in March 2020 but the COVID-19 situation forced a revision for delivery in a virtual environment. They will use the PowerDMS platform to conduct the delivery starting sometime in May 2020.

IMT encourages the VIPD to develop and deliver a similar course for managers directed at the Use of Force investigations issues of Paragraph 37 and others. As noted for the supervisor version there is a large body of material from the IAPro system and various evaluations of cases that can be used to create a directed experience for the attendee that hopefully will have an impact on compliance issue there. This course, along with the Citizen Complaint investigation one, should be the start of an expanded focus on development of the department's managers.  This is especially important as there is no current career development course focused on new managers or specific functional areas of their responsibilities.

> **Assessment:**   This is a new area for the VIPD but the initial offering for the Citizen Complaint area was encouraging and met the CD's requirement as well as the issue that have caused the Citizen Complaint compliance problems. IMT sees it as a possible turning point that will enhance the career development of these personnel. As noted in Section A- the design section,  we found the material meeting the requirements and look forward to observing the delivery.

> **Recommendations:**
> - As noted, expand the concept to the Use of Force compliance problem area.

## 5.  Special Unit Training Delivery Review

VIPD arranged for ATF to provide refresher training on FRB and FIT operations in late 2019. IMT sat in on the course and reviewed the materials and found that the materials and training did not adequately refer to and train on VIPD specific policy and procedure. IMT recommended more VIPD focused training. VIPD subsequently arranged to the Virgin Islands Public Safety Foundation to develop and deliver more VIPD focused training. IMT coordinated with the Foundation instructors and provided the material used by IMT in 2016 to initially train the unit personnel to assist in their development. The training was conducted in last week of February 2020 and IMT again sat in on the training and found it responsive to VIPD needs.  IMT observed an FRB review during their early March monitoring trip and found the operation was greatly improved from the last one in November 2019.

**Assessment:** The training delivered was compliant with both the CD and VIPD policies.

**Recommendations:** None

### 6. Individual and Other Training Delivery Review

Using existing Use of Force investigation lesson plans, VIPD conducted individual or small group training for personnel identified by either the Use of Force Workgroup or the CCMU as being deficient in conducting those investigations. In addition, they conducted numerous remedial training instances where individual officers were referred as a result of either use of force or Citizen complaint investigations. These personnel were evaluated using tests that existed for the specific lesson plans via power DMS.

**Assessment:**  the VIPD conducts very few internal individualized training courses but those they do are usually based upon an existing and/or approved lesson plan and utilized the power DMS for testing. Those that IMT have reviewed appear to be consistent with CD requirements.

**Recommendations:** None

### 7. Roll Call Training Delivery Reviews

VIPD had in the past struggled to develop and deliver a consistent roll call training program. Starting in 2019 the training Bureau developed six-month schedules for Roll Call Training. However as noted previously the virus disruption of the departments information systems as well as the ransomware attack on the IAPro system disrupted delivery throughout most of 2019, however some recovery was seen in the latter part of the year. The department has now posted a six-month Roll Call Training (RCT) schedule that is reflected in table shown in Section A, 7, above.

Previous delivery issues appear to have been corrected and the most recent class, on Vehicular Pursuit was posted on schedule and follow-up activity is on-going to determine why some personnel did not take the course. Lists of no-shows have been transmitted to

the Chiefs for review and action, including providing Training with schedule for retraining.

> **Assessment:**  While RCT remains to be a delivery challenge, it has  improved in terms of availability of the training product by Training. However, responsiveness of Operations to the completion of the training and subsequent testing is lagging behind. Random reviews of PowerDMS for RCT completion and testing is less than adequate and will require emphasis by Operations commanders.

> **Recommendations:**

> - Operations should concentrate on ensuring that all personnel participate in the training when it is available and take all required tests. Personnel who repeatedly fail should be subject to administrative actions.

> - Training should continue to update the schedule every six months.

## 8.  Firearms Training Delivery Reviews

Firearms re-certification or requalification was completed on both islands during the fall of 2018 and normal firearms training (including classroom components), was accomplished in the Spring of 2020, except for some range firing on STX due to range availability issues. Follow-on qualification for rifles and specialized weapons was accomplished by the end of November 2019 with make-ups in December 2019. UOF refresher training has been integrated with the Part I scheduled firing, while Part II is mere qualification firing.

> **Assessment:**  Firearms Training deliveries have built on initial efforts in early 2018 and are keeping pace with requirements. New re-certification lesson plans are complete and were for use for the Part I in 2020. Scheduling appears adequate, at least that handled by the Training Bureau. Delivered training is judged complaint with CD requirements.

> **Recommendations:** None

## 9.  Less Lethal Weapon Re-Certification Delivery Reviews (LLR)

VIPD conducted re-certification classes on the OC Spray, TASER, and Baton, during 2019. CEW (TASER) instructors were recertified by Axion in 2019 also. The department

received new versions of the TASER and all personnel assigned one were certified on them. All personnel issued OC Spray were reissued new canisters during 2019 and an inventory weight check was accomplished; the next weigh in will be during Part II IST firearms training in the fall.  CEW policy was reviewed and updates were completed in July 2019 and an Annual Audit of the CEW units was completed in late July 2019. Annual re-certification for the TASER classroom portion was completed via PowerDMS and a 60-day extension was approved by the Commissioner for physical discharge of the cartridges. Virtual training using PowerDMS for recertification will continue during the COVID-19 pandemic.

> **Assessment:** Recertification of LLR subject areas appears on track with continued use of compliant RCT and LLR curricula. Even with the current restrictions VIPD appears to be making a concerted effort to retain compliance as well as certification of their officers in Less Lethal weapons. IMT evaluates that they remain compliant with the requirements of the CD.

> **Recommendations:**

> - Resume physical activity recertification requirements at the earliest safe opportunity.

## 10.  Training Advisory Committee (TAC)

The TAC meetings have been scheduled and conducted every quarter since our last report, with the most recent meeting conducted on April 30, 2020. The agendas were distributed in advance and were complete and adequate for the meetings, with a variety of supporting documents attached. A copy of the agenda can be viewed at Appendix B to this document. Meeting was conducted professionally by the Training Director and attendance by Operations personnel has increased over the four quarter with both Chiefs and several Deputy Chiefs in attendance. Meetings generally last for two hours and all required CD lesson plan and policy review have been accomplished throughout the year. IMT has sat in on every one and has been pleased with the conduct and results, especially the interactive discussions. Each meeting is summarized in a report to the Commissioner produced by the Training Director and these have been well written and informative. The

bottom line is much better than past years and an effective tool for the review process envisioned by the CD.

> **Assessment:**   The recent TAC meetings have been an improvement over past efforts and as such have contributed to the timely review of some lesson plans and related VIPD policies, although once they are forwarded by the TAC to the Policy Review Committee, the process is no longer controlled by the TAC. The Planning Director is a member and attends the TAC meetings and provides status of policies under review to the committee. The protocol and the meetings are compliant with CD requirements.

> **Recommendations:** None

## 11.   Field Training and Evaluation Program (FTEP) or Field Training Officer (FTO) Program

The TAC and the Training Bureau conducted a review of the FTEP process and as a result a revised version of the VIPD FTEP policy is awaiting the Commissioner's signature. FTO training based on anticipated revisions to the policy was conducted on STT and STX in October 2019. However, indications are that Operations have not sent in any of the required reporting to the Training Bureau this year, despite IMT meeting with the Deputy Commissioner for Operations last year to seek his assistance with is issue. It is important to note that beyond the training of the FTOs, review and update of the policy, and storage of required reporting forms, operational control of the program rests with Operations.

> **Assessment:**   The newly revised FTEP policy and subsequent training of the FTOs last year was conducted in compliance with CD requirements **for consistency** in FTO delivery of ELT training course content. The downfall, if any, falls on Operations with reporting follow through and oversight.

> **Recommendations:**
>
> - Department management should mandate Operations comply with its responsibilities under the revised directive for reporting activity.
>
> - Training should continue to make sure FTOs have copies of the latest ELT lesson plans to ensure consistency in the reinforcement training function.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

## C.  **Evaluating Training Effectiveness (52, 58, 64, 74)**

To know if training is effective some measure of evaluation is required to determine its impact on the performance of personnel being training or in other words, was the training effective in changing performance behavior. There is general agreement within the training industry that evaluations are required at several levels or focus points of the training cycle. The industry standard process uses four levels of evaluation.[27]  These are:

- Level One – Reaction to the Training
- Level Two – Learning Transfer
- Level Three – Behavior Change
- Level Four – Results Across the Organization

IMT has worked with the Training Bureau to develop an evaluation protocol that addresses the CD referenced training components, focusing efforts on Levels One through Three. We developed consensus with a draft SOP in April 2019, and after further talks, Training agreed to implement as modified in later discussions.

While the VIPD seemed comfortable with Levels One and Two, they expressed reluctance to embark on Level Three, e.g., follow-on surveys of attendee and their supervisor's opinion if job performance had improved as a result of the training. As a compromise, IMT suggested a version of Level Three that utilized available data on job performance overall, all of which is compliant with CD requirements. This included data from

- The department's IAPro system,
- Recommendations from the Training Advisory Committee (TAC),
- CCMU audits,
- Input from the Force Review Board,
- Comments and memoranda from Operations commanders and managers,
- Recommendations and observations from the CD monitors (while CD remains in force), and
- Observations by Training Bureau staff of training deliveries.

---

[27] "Evaluating Training Programs" 3rd Edition, Donald L. Kirkpatrick and James D. Kirkpatrick, Berrett-Koehler Publishers, Copyright © 2009, All Rights Reserved

By consolidating and reviewing these data sources, aggregated by lesson plan subject area, the VIPD could distill needed changes based on field performance generally and thus maintain a reasonable Level Three focus. In addition, it met CD requirements for using the Risk Management System data for evaluations. In addition, the Evaluation protocol at Level Three includes input and monitoring comments by the CCMU whose staff participates in the TAC meetings. The result would be both TAC related reviews of performance data as well as separate training Bureau reviews as needed for specialized training requirements.

VIPD continues to utilize this SOP to conduct evaluations at all three levels, with levels One and Two effected through the PowerDMS system. Instructor evaluations are conducted by the Training Bureau staff in accordance with the SOP.

> **Assessment:**   With the adoption of the draft SOP for evaluations, VIPD is now in compliance with the CD requirements for evaluation of training. Instructor evaluations are conducted by the Training Bureau staff in accord with the same SOP.

> **Recommendations:**

> - Continue to evaluate instructional staff, even while conducting virtual sessions, for performance. Post evaluations to a special section of PowerDMS.

## D.  Recording the Training in the Training Records Management System (76, 77).

The PowerDMS system is a comprehensive and versatile database management system that focuses on training records of all types. The VIPD selected this system in 2013 as their standard for compliance with the CD requirements for training records management. The records currently maintained by the system cover items noted in the Consent Decree. However  the location, relationship to other items, and coverage frustrate review and reporting  supportive of Paragraph 76-a and 77-b. This impacts effective use of the data to initiate training improvements.

A record management system is only as good as the material submitted and how it is loaded. The Training Bureau has no comprehensive protocol for management of the PowerDMS system. The organizational structure of the system had suffered in past years, but the Training Bureau has reorganized the items in a more logical manner.  As a result, the system is more efficient for the user.  In addition, attendance at the recent PowerDMS conference in Orlando in March 2020 was

deemed very helpful to staff by the Training Director and despite the lack of uploading during the department information system problems in 2019, uploading has been resumed and the paper copies kept during the outages are now being uploaded. In addition, previous problems that surfaced when attempting CD required output reports on student training histories is now being corrected with a revised protocol for uploading the records. In non-computer language instead of uploading an entire session list of student and scores (e.g., a group of records), each student record is being uploaded individually to the system. This facilitates individual as well as group records retrieval as well as enhances data accuracy.

1. **Review and Updates to Training and Policy Products**

There are sections within the PowerDMS structure where curricula and policy are listed, with the *Polic*y option under *Documents* being well structured and naming commensurate with actual titles; this includes Commissioner Directives. Curricula under Lesson Plans are vastly improved and courses and classes are more easily found by the user. IMT periodically checks the policy section to determine if the most update eversion is available and has found for the last year that is the case. Random selection of courses and associated attendance records were found to be complete and accurate.

2. **Tracking Policy, Curricula Modifications, Versions and Naming Protocols**

Training, as well as Planning and Policy, both have a role in carrying out the decisions of the TAC for changes in policy and curricula as well as tracking the process of any corrective action. In one case, lesson plans and other curricula require modifications as policy is changed and in others, these changes are generated by data analysis from IAPro and CCMU audits. The CD requires that cases (UOF and CC) be evaluated for potential changes to policy and or training, which VIPD determined would be accomplished by the TAC, with the Training Director as the Chair. The Policy Committee and the Planning and Research Bureau effect the policy change, while Training makes the curricula changes and forward same to legal for review and approval if required by the subject matter. Once changes are affected, Policy has to upload the new policy to PowerDMS and Training uploads the revised curricula. IMT spot checks indicate this process is being followed.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

While PowerDMS has a workflow capability that tracks document modifications through an edit and review process, and while IMT cannot access that function, our understanding is that there has been little use. Further complicating this is lack of standardization of naming of both policies and curricula, which, coupled with less than optimal organization of the records, makes researching and working with them difficult. PowerDMS is a very flexible database and its organizational structure can be adversely impacted by inadvertent upload errors, so some standardization is needed for both the curriculum and policy changes as well as the remedial training component. Creating a comprehensive SOP for management of the PowerDMS system could address many of these issues.

### 3.  **Follow Through on Course Loading and Student Completion**

This area was stagnated because of the VIPD computer system problems in 2019 and since there has been intermittent blackout of the web access needed for PowerDMS access. IMT is aware of this problem and has worked with VIPD to address this issue. Now that systems are back up, Training has instituted an ongoing uploading of documents accrued during the past year and should be caught up by June 2020. CCMU will then need to reassess the system for compliance.  VIPD is confident that their experience at the recent PowerDMS conference will enhance their productivity in this regard.

**Assessment:** The problems identified with the PowerDMS system appear to have been generally corrected and VIPD has an ongoing upload process underway to catch up on past records. Use of the workflow protocol within PowerDMS can improve the speed with which polices are reviewed and updated.

**Recommendations:**

- VIPD should consider the workflow protocols within PowerDMS to manage policy revisions as well as curricula development and review.
- VIPD should actively work towards a June 2020 completion date for all backlogged records.
- VIPD should establish a PowerDMS management portion for the Training Bureau SOP.

**E.  <u>Summary</u>**

The VIPD Training Bureau has made significant gains in maintaining compliance and developing more user-focused training products. They have worked around two significant interruptions to their activities, the computer system attack and the COVID-19 situation and have come out with some innovative ways to address training and keep it supporting the department and the CD objectivizes. The Training Bureau leadership and staff are complemented for their work under adverse conditions. IMT recommends to the Court that they remain in Substantial Compliance with the CD requirements.

## V.   IMMEDIATELY AVAILABLE FIXES

A number of actions can be taken almost immediately to treat the problem paragraphs.

- **Revisit/Strengthen the FII Function**
  To date, the VIPD has not demonstrated the spirit and full intent of this very promising concept.  (See Chapter II.)

- **Ensure that lessons learned from the FII process are recognized as the CCII protocol continues to roll out.**

- **Systematize Follow Through on In-House Audit Recommendations**
  A persistent obstacle to compliance has been and is VIPD's tendency to fail to follow through, and often ignore, potentially effective recommendations provided internally. Compliance audit work is most obvious.  The FRB just published a Two-Year Annual Report.  It contains a Patterns & Trends section offering a series of grounded/case-centered recommendations, set up for consideration and follow through, or rejection.

For the longer term, IMT recommends that the VIPD, in order to address the prevalent accountability issues, conduct an in-depth review of their leadership development process. This is based upon observations of over ten years of monitoring and identification of shortcomings in meeting CD compliance requirements, especially in the area of accountability for administrative investigative failures.


The IMT in numerous previous quarterly reports has identified issues with accountability primarily related to holding either Use of Force or Citizen Complaint case investigators accountable. This accountability issue runs from the simple lack of holding people accountable for their failures in supervisory level administrative reporting thru the lack of addressing the failures of upper level management. As accountability is a key component of leadership development, its absence can be related to both the personnel management process as well as training support to that process

# VI.   **APPENDICES**

## APPENDIX A

## Listing of IMT Assessed Use of Force incidents

| UOFT2019-0098, 0099 | Level 2 |
|---|---|

**Incident Information:**  This incident began as a dispatched call for a man walking in and out of the flow of traffic.  The man was reported as interrupting the flow of traffic.  An officer gave commands to the male to step out of traffic.  A second call was received of the male remaining in the roadway and striking vehicles with his hand.  The same officer responded and gave verbal directions to the male.  The male was escorted out of traffic.  As the man was being escorted out of traffic, he attempted to disarm the officer's Taser from his holster.  The officer successfully applied a leg sweep takedown on the male.  The male then began to kick his legs at the officer and the officer struck the male with his baton several times on his leg. The male continued to resist arrest and kick at the officer.  An off-duty supervisor responded to the scene to assist the officer.  The off-duty supervisor stood on the man's legs and ankles for purposes of pain compliance technique.  The officer was then able to secure the man into custody.

After the male was secured, the remaining parts of the incident and investigation fell apart and did not comport to VIPD Policy and or the Consent Decree.  At this stage of the department's status in substantial compliance with the Consent Decree, all parts of what should occurred failed including the involvement of leadership in the proper handling of this investigation.

On April 17, 2020, the IMT met and conversed with the VIPD CCMU.  The CCMU did a nice job of assessing each Consent Decree paragraph and providing their overall assessment.  Their review/ assessment were coordinated in a team environment.

The incident contained several VIPD Policy and Consent Decree Requirements:

**CD Paragraph 33** – lack of notification to a supervisor of a use of force incident.  An off-duty seasoned supervisor was involved in the use of force incident and did not properly contact a supervisor.  Instead, the supervisor phoned several Internal Affairs Investigators.  One of the investigators instructed him to contact a supervisor.  The supervisor and involved officer proceeded to the police station to complete their paperwork and several supervisors and commanders were present when the off-duty supervisor was present in the station.  The supervisors failed in interjecting their authority in determining the reason(s) as the off-duty supervisor being in police station.

**CD Paragraph 34** – a supervisor was finally assigned to investigate the matter some 8-hours after the incident.  The supervisor met and conferred with the subject of force the next day and inquired as to what occurred.  The subject of force could not remember what occurred during the incident.  The supervisor failed to provide a full and accurate description of what occurred during the use of force incident.  More importantly, the subject of force injures were not

assesses fully in order to determine what occurred in order to either justify or fail to justify the officer's actions.

**CD Paragraph 36** – the subject of force was taken to the hospital without the knowledge of a supervisor notification. The subject of force sustained lacerations on the rear of both his left and right arms above his elbows. The investigating supervisor stated the injuries were a result of the subject actively resisting arrest on the ground where he was pulling his hands away from the involved officer and twisting his body. This same supervisor stated he took a statement from the subject of force at the jail the day after the use of force incident. The subject told the supervisor he does not remember being involved with the police only being treated at the hospital. Thus, the supervisor must have speculated on how the subject of sustained the injuries as opposed to receiving first-hand information.

**CD Paragraph 37** – the investigation failed to meet the requirements of a quality review and appropriate discipline:

1. The investigating supervisor noted a month after the incident disciplinary charges would be filed against the off-duty supervisor for his failure to contact a supervisor. The investigating supervisor filed the charges against the officer one (1) day after the required Law Enforcement Supervisor's Union (LESU) provides a 50-day maximum requirement for filing charges. The Hearing Officer dismissed the incident against the involved supervisor. The investigative package and or records do not provide documentation the investigating supervisor was counseled for failing to meet the CBA requirements.
2. The investigating supervisor stated the off-duty supervisor complied with the provisions of VIPD Off-duty policy 3.8. The policy requires specific requirements for off-duty personnel. The off-duty supervisor did not fulfill the requirements of the policy.
3. The investigating supervisor did not inquire into the subject of force injuries.
4. The investigating supervisor did not conduct the audio interviews under the required policy limits.
5. The final review by a lieutenant provided a final disposition of Justified Within Policy. Several policy violations were identified in a joint CCMU/ IMT review.
6. There is no assessment of the off-duty supervisor stepping on the legs/ ankles of the subject of force and using such pain compliance technique. The IMT could not locate such movement in an approved VIPD lesson plan.

| | |
|---|---|
| **UOFT2019-0100, 0101, 0102** | **Level 3** |

**Incident Information:** Officers responded to a residence regarding a domestic disturbance. A mother had the called for the police to assist with her son who was destroying items in the residence. The complainant stated her son was using marijuana and became agitated in the resident. Her son then became destructive and began shouting, cursing, and destroying furniture in the home. Officers attempted to converse with the male and gain his cooperation, but the male would not obey officer instructions. The male exited out the front door and stated he was not going to jail. The male removed his shirt, threw it on the ground, and they attempted to re-enter the residence. Officer's blocked his path back into the home and the male pushed at officers. Officers grabbed onto the male as he struggled with officers. The officers conducted a takedown on the male and he was handcuffed and taken into custody.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

| UOFT2020-0004, 0005 | Level 4 |
|---|---|

**Incident Information:**  Officers were dispatched to a school yard area for several school children fighting.  Upon arrival, officers did not locate any fighting, but remained in the area to ensure there was no disturbance.  The officers then observed several females yelling and fighting in the nearby courtyard.   Officers proceeded to this area and located several individuals fighting with each other.  The officers grabbed and pushed individuals off of each other in attempt to stop the fighting.  Two videos were attached to the investigative file, which indicated several females and some males physically fighting with each other.  In one of the videos, you can observe a VIPD Officer attempting to stop the physical fighting by pulling off individuals who were on top of each other.

| UOFT2020-0007, 0008 | Level 4 |
|---|---|

**Incident Information:**  Officers were dispatched to a residential housing area to investigate a report of an emotionally disturbed female.  The female was naked and creating a disturbance. It appeared from officers the woman had emotional issues.  Officers grabbed onto the woman as she was walking on glass and placed their arms and hands on her shoulder blades as to prevent her from falling.  The woman was then handcuffed and transported to the hospital.

| UOFX2020-0001 | Level 4 |
|---|---|

**Incident Information:**  Two individuals began to argue and fight in the street during a festival.  Two VIPD personnel broke up the fight between the two individuals.  One of the involved officers, a sergeant indicated they restrained one of the individuals by holding one of the individuals by their arms in order to restrain the individual.  The IMT met and conferred with the CCMU regarding this incident.

There were concerns regarding the involvement of a witness officer, who may have been involved in the incident.   The response to resistance report lacks specific facts and circumstances as to what occurred.   The supervisor's evaluation did not include a precise description of the facts and circumstances that either justify or fail to justify the officer's conduct **(CD Paragraph 34).**   The investigation was finally approved by a commander without a completed and thorough assessment **(CD Paragraph 37).**

| UOFX2020-0002, 0003 | Level 3 |
|---|---|

**Incident Information**:  An officer observed an individual walking along a road way and staggering.  The officer stopped and inquired of the man's behavior.  The officer stated the male was sweating profusely and had dilated pupils.  The officer believed the individual was under the influence of drugs.  The officer observed the male to throw a plastic baggie into the grassy area.  The officer inquired with the male over the dropped bag.  At the same time, another officer responded and assisted.  The male would not listen to the officers and began to quickly around the area and refused to address his throwing the plastic baggie.  One of the officers grabbed onto the male's wrist, but the male pulled back and refused to cooperate with officers.  Both of the officers grabbed onto the male and conducted a take down on the subject. The individual continued to resist arrest by pulling away from officers.   Officers then attempted to handcuff the individual by using wrist locks on both hands.  The officers had to

use two sets of handcuffs to finally secure the individual into their custody.

The investigator who completed the investigation stated the following in their risk management assessment: "Based on the investigation, it is the investigator's recommendation that the deputy chief refrain from responding to incidents that may lead him to utilize force. As the deputy chief, he is the Level II Hearing Official and if utilizes force with other officers would have to recuse himself from being the hearing official and can lead to him not being impartial to other use of force investigations." This statement is counterproductive to effective policing. The deputy chief should not refrain from getting involved in a use of force incident and in the particular incident the chief came across the incident. The deputy chief cannot simply ignore an incident and most incidents are rapidly involving and dynamic in nature. If the deputy chief is involved in future incidents, the VIPD will have to modify his role as a hearing officer and select and alternate.

| UOFX2020-0004 | Level 4 |
|---|---|

**Incident Information:** A deputy chief of police observed two individuals along the roadway as he passed them in his squad car. The individuals had their faces obscured with their hoodies. It appeared to the deputy chief the individuals were going to fight each other. The deputy chief turned his squad around in order to inquire on the activity of the two individuals. At the same time, the deputy chief requested information from the 911 Center if any criminal activity had been reported. The deputy chief learned there was an attempted robbery at the KFC restaurant. The deputy chief located the two individuals and he removed his .45 caliber assault rifle, pointed it at both males and ordered them to the ground. One of the individuals complied and dropped to the ground. The second individual pulled out a firearm from his waistband and discharged four (4) rounds at the deputy chief. A back-up officer responded and took the male who complied into custody. A criminal investigation was ensued for the second subject.

The IMT and the CCMU met and conferred regarding this use of force incident. Although the incident was approved within VIPD Policy, the IMT and CCMU disagree with the approval of the incident for the following reasons:

The deputy chief contacted the Internal Affairs Director regarding the use of force, but this was not part of the supervisory report **(CD Paragraph 33)**. The investigation was conducted by an Internal Affairs investigator. The investigative report failed to justify the actions of the deputy chief **(CD Paragraph 34)**. The investigative report failed to justify the deputy chief's actively pointing of an assault rifle at two individuals. The investigator failed to meet the Constitutional Standard of *Graham v Connor* in a police officer's use of force. Pointing of a firearm is a use of force. In this incident, the deputy chief failed to state why he actively pointed an assault weapon at two individuals. The deputy chief failed to connect the two individuals with any crime; failed to state the threat from the individuals; failed to mention if and how the two individuals were either resisting arrest and or fleeing from the deputy chief.

The investigative report did not assess the use of the assault rifle. The deputy chief did not have the authority per VIPD Policy to utilize the weapon. The IMT learned through a most recent discussion the assault weapon is not an authorized weapon approved for use by the

Police Commissioner.  The IMT discussed the incident with the VIPD and CCMU on March 31, 2020.  The investigative report did not contain an assessment of the use of force and or the use of the assault rifle **(CD Paragraph 37)**.  The IMT was told there would be a revised investigative report and as of April 22, 2020, the IMT has not received the any updated investigative documents.

| | |
|---|---|
| **UOFX2020-0005, 0012, 0013** | **Level 4** |

**Incident Information:**  Officers were dispatched to a restaurant for a woman who was threatening individuals with a stick.  The woman had already left the location, but the officers learned the woman had cursed at patrons and the complainant stated they felt the woman had some mental issues.  Officers then learned the woman was observed in an area and the officers proceeded to this area.  Upon arrival, the officers located a woman with a 4' stick in her hand.  When the officers approached the woman, she told the officers "don't fuck with me, ayo don't know what I can do."  Two officers exited their squad car and approached the woman who threatened the officers and raised the stick as if the woman was going to strike the officers.  The officers stated they repeatedly asked the woman to drop the stick.  The woman refused to obey the officer's commands and began to walk in the direction of two additional officers.  At this time, one of the officers grabbed the stick from the woman and the woman reacted by grabbing onto the officer's hair loc.  The woman would not free her hand from the officer's hair lock, so the officer released the grip from the stick and grabbed onto the woman's hand that a grip on her hair loc.  The officer stated the two fell to the ground **(CD Paragraph 34)**.  The three remaining officers then assisted and took the woman into custody by handcuffing the woman.  The report indicates the woman was handcuffed in the front of her body, but neither the officer's nor supervisory report indicates why this occurred.  The woman was then secured in the squad car, but prior to being fully placed in the auto the woman grabbed ahold again of the officer's hair lock and removed the hair from the officer's head.  The woman was eventually transported to the hospital for medical assistance for her mental condition.  The officer response to resistance reports indicate the involved officer and woman fell to the ground.  There is no further articulation as to how the officer and woman fell to the ground **(CD Paragraph 32)**.  The investigating supervisor does not assess on how the two fell to the ground.  The investigative package includes several photographs of the subject of force.  Specifically, there are photos in the investigative file that pertain to the eye and facial area of the individual.  The supervisor's report does not contain information as to why the photographs were taken and or included in the investigative file; any mention as to any injuries the subject may have incurred **(CD Paragraph 37)**.  The supervisor's report does not indicate as to what communication/ plan effort was made between officers on how they would negotiate removing the stick from the woman **(CD Paragraph 31)**.

| | |
|---|---|
| **UOFX2020-0008** | **Level 4** |

**Incident Information:**  A supervisor came across two individuals fighting in the middle of the roadway.  One of the individuals struck the side of the face of another man's face and the supervisor intervened to stop the fighting.  The supervisor used his hands on the subject to cease their fighting with each other.  Responding units arrived and assisted the supervisor.  The aggressor was handcuffed and arrested.

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

| UOFX2020-0011 | Level 4 |
|---|---|
| Incident Information:  An individual was in-custody for assaulting two officers.  The subject was being processed in the police station and requested to use the bathroom.  The subject took off from a police lieutenant and fled out of the police station.  The lieutenant proceeded out of the police station in an attempt to locate the individual.  The lieutenant located the individual hiding in some bushes.  The male refused the supervisor's order and stated he did not want to go back to jail.  The lieutenant actively pointed his firearm at the individual, who then cooperated.  The male was then brought back to the police station.  The lieutenant stated he felt an overwhelming fear for his safety and an additional supervisor who was with the lieutenant.  The lieutenant failed to articulate on how deadly force would be possible for the escape and a prior incident involving an injury to a police officer.  The investigating captain failed to articulate on how actively pointing a firearm was a justifiable use of force **(CD Paragraph 34)**.  In the event the subject did not cooperate with the officer, the officer was now forced into a deadly use of force situation.  According to the arrest report, the male was a known mental subject.  The report does not mention any disengagement **(CD Paragraph 31)** with the known mental subject.  There was no assessment if the lieutenant considered any less-lethal force options.  The final reviewer in the chain of command should have inquired into the use of force before approving the incident along with assessing why the subject of force was not secured in handcuffs before running out of police station.  **(CD Paragraph 37).** | |

First Quarterly Report of 2020   DRAFT
From the Independent Monitor for the U.S. Virgin Islands Police Department

APPENDIX B



## TRAINING ADVISORY COMMITTEE MEETING

## AGENDA

## APRIL 30, 2020

1. Introduction
2. Training Advisory Committee Directive
3. Update from last meeting
   A. CEW/ Policy 3.6 (Revised)
   B. Use of Force/ Policy 3.1 (Status Update)
   C. FTO Policy (Status)
   D. Roll Call Training (CEW and Vehicle Pursuit)
4. Review of Use of Force Lesson Plans and Policies:
   A. Firearms/ Policy 3.4 (Update)
   B. CEW Lesson Plan (Updates Completed based on Policy Changes)
5. Use of Force Issues
   A. UOF Training Updates (Firearms Qualifications STX, TASER Recertifications on STT/STX)
   B. UOF Data as it relates to Training Provided (OC, Impact Weapon Use, TASER Deployments)
   C. UOF Investigation Assistance Letters (audit reviews)
   D. Force Review Board Updates (Hearing held in March)
6. Trends and Patterns in Citizen Complaints (Analyst will Assist with Data)
   A. Citizen Complaints Assistance Letters (audit reviews)
7. Supervisory Training and Commander/Reviewers Training (CC Investigations)
8. Up Coming Trainings
9. Open Discussion

## THANK YOU FOR ATTENDING AND PARTICIPATING.